## LOUISVILLE & NASHVILLE RAILROAD CO. *v.* WILSON.

1. A widow has an interest in the unburied body of her deceased husband, which the courts will recognize.
2. Where a declaration alleged that a widow desired to have her husband's body carried by a railroad from the place of death to the place of intended burial; that the route was over the railroad to a junction, and thence by a branch of the same road to the destination; that the agent of the company at the initial point would only sell her transportation for the body to the junction, but told her that the company would carry the body to the place of burial, and that at the point of junction she could obtain transportation to the destination; that she paid for such transportation to the junction, and delivered the body, with its accompanying shroud and coffin, to the company; that on arrival at the junction the company's agent had the coffin and body placed on an open platform in the rain, and allowed it to remain there for several hours while waiting for the second train to arrive, and refused, on request of the wife, to have it placed where it would be protected from the weather; and that the coffin and shroud were damaged to the extent of $75, and the body was "soaked and otherwise mutilated": *Held*, that the declaration set out a cause of action.

Argued April 13, — Decided May 15, 1905.

Action for damages. Before Judge Seabrook. Warren superior court. September 10, 1904.

Penina Wilson brought suit against the Louisville and Nashville Railroad Company, a foreign corporation, as the lessee of the Georgia Railroad and Banking Company, a corporation under the laws of Georgia. She alleged that the defendant company had damaged her in the sum of $2,000, for the following reasons: On or about the 12th day of March, 1903, her husband, Hamp Wilson, died in Atlanta, Georgia. After his death she delivered his body to the defendant company, to be carried from Atlanta to Warrenton, Georgia, where it was to be buried. Defendant has a railroad and operates trains between said places. She notified the defendant that she was going to carry her husband's body to Warrenton, and offered to pay for the transportation thereof. The agent at Atlanta refused to sell her transportation further than to Camak, a junction point on the defendant company's

road.   Petitioner paid defendant for the transportation to Camak, and informed it that she was going to carry the body of her husband on to Warrenton.   The said agent informed petitioner that the body of her husband would be carried by the defendant company, and that she could buy transportation from Camak to Warrenton.   Defendant agreed to transport the said body of petitioner's husband from Atlanta to Warrenton, and accepted pay therefor.   When the train bearing the body of her husband arrived at Camak, in the county of Warren, the coffin containing it was taken from the train by the defendant company and placed on an open platform, and there allowed to remain several hours until defendant's train going to Warrenton arrived.   When the said body was taken from the train, it was night, and raining.   Petitioner and others requested the agent of the defendant company at Camak to have said body placed where it would be protected from the rain and weather, but he refused to do so.   Petitioner shows that as a result the said body of her husband, the shroud, and coffin were " soaked and otherwise mutilated."   By reason of the facts above set forth, said coffin and shroud were damaged to the amount of $75, and she was subjected to great humiliation and shame and mental suffering.   Defendant was a common carrier.   She charged that it was wanting in ordinary care, and in fact was grossly negligent.   She also alleged a property right in the coffin and shroud.   The defendant company demurred generally to the petition.   The court overruled the demurrer, and to this ruling the defendant excepted.

*Joseph B. & Bryan Cumming*, for plaintiff in error.
*L. D. McGregor, Burton Smith*, and *J. A. Branch*, contra.

LUMPKIN, J. (After stating the facts.) Death is unique. It is unlike aught else in its certainty and its incidents. A corpse in some respects is the strangest thing on earth. · A man who but yesterday breathed, and thought, and walked among us has passed away.   Something has gone.   The body is left still and cold, and is all that is visible to mortal eye of the man we knew. Around it cling love and memory.   Beyond it may reach hope. It must be laid away.   And the law — that rule of action which touches all human things — must touch also this thing of death. It is not surprising that the law relating to this mystery of what

death leaves behind can not be precisely brought within the letter of all the rules regarding corn, lumber, and pig-iron. And yet the body must be buried or disposed of. If buried, it must be carried to the place of burial. And the law, in its all-sufficiency, must furnish some rule, by legislative enactment, or analogy, or based on some sound legal principle, by which to determine between the living questions of the disposition of the dead, and rights surrounding their bodies. In doing this, the courts will not close their eyes to the customs and necessities of civilization in dealing with the dead, and those sentiments connected with decently disposing of the remains of the departed which furnish one ground of difference between men and brutes. It is said that burial in churchyards was introduced into England by Cuthbert, Archbishop of Canterbury, in the year 750 A. D. At an early date the church began to take jurisdiction in regard to places of burial and the sepulture of the dead. This jurisdiction gradually became more enlarged and more firmly fixed, until the ecclesiastical courts left little for the common-law courts to decide upon those subjects. Thus it was that Lord Coke said, that the burial of a corpse belonged to ecclesiastical cognizance; but the heirs had an action for defacing the monument (1 Inst. 4, 18 B; 3 Inst. 203); and so it was that Blackstone made use of the much-quoted expression, " But though the heir has a property in the monuments and escutcheons of his ancestors, yet he has none in their bodies or ashes; nor can he bring any civil action against such as indecently, at least, if not impiously, violate and disturb their remains, when dead and buried. The parson indeed, who has the freehold of the soil, may bring an action of trespass against such as dig and disturb it; and if any one in taking up a dead body steals the shroud or other apparel, it will be felony, for the property thereof remains in the executor, or whoever was at the charge of the funeral." 2 Bl. Com. 429. See Hammond's ed. 651, and note on p. 653.

The subject of the right of burial, and the protection of the bodies of the dead arose in the matter of the widening of Beekman street in the City of New York, and was referred to Hon. Samuel B. Ruggles, as referee. He made a learned and elaborate report, which was confirmed by the court. It will be found in 4 Brad. R. 503, et seq., and from it the following excerpts are taken:

" The power thus exercised by the ecclesiastical tribunals was not spiritual in its nature, but merely temporal and juridical. It was a legal, secular authority, which they had gradually abstracted from the ancient civil courts, to which it had originally belonged; and that authority, from the very necessity of the case, in the State of New York, must now be vested in its secular courts of justice. The necessity for the exercise of such authority, not only over the burial, but over the corpse itself, by some competent legal tribunal, will appear at once, if we consider the consequences of its abandonment. If no one has any legal interest in a corpse, no one can legally determine the place of its interment, nor exclusively retain its custody. A son will have no legal right to retain the remains of his father, nor a husband of his wife, one moment after death. A father can not legally protect his daughter's remains from exposure or insult, however indecent or outrageous, nor demand their reburial, if dragged from the grave. The dead, deprived of the legal guardianship, however partial, which the church so long had thrown around them, and left unprotected by the civil courts, will become, in law, nothing but public nuisances; and their custody will belong only to the guardians of the public health, to remove and destroy the offending matter with all practical economy and dispatch. The criminal courts may punish the body-snatcher who invades the grave, but will be powerless to restore its contents. . . The sacred relics of Mount Vernon may be torn from their ' mansion of rest,' and exhibited for hire in our very midst, and no civil authority can remand them to the tomb. . . It will be seen that much of the apparent difficulty of this subject arises from a false and needless assumption, in holding that nothing is property that has not a pecuniary value. . . The world does not contain a tribunal that would punish a son who should resist, even unto death, any attempt to mutilate his father's corpse, or tear it from the grave for sale or dissection; but where would he find the legal right to resist, except in his peculiar and exclusive interest in the body? The right to the repose of the grave necessarily implies the right to its exclusive possession." The report of the referee has been criticised by a writer in 10 Central Law Journal, 303, but it has been cited with approval by nearly all the courts which have since dealt with the questions there involved. It is said Mr. Ruggles added a note to the original report, in explanation of the term

" next of kin," stating that it " was not employed for the purpose of denying or questioning the legal right of a surviving husband to bury his wife's remains, or to reinter them if disturbed." Hackett v. Hackett, 18 R. I. 157. For those who desire to consult law literature on burial grounds, burials, etc., an extended list will be found in a note to 18 Abbott's New Cases, 75.

In Pierce v. Proprietors of Swan Point Cemetery, 10 R. I. 227, it was held, that " while a dead body is not property in the strict sense of the common law, it is quasi property, over which the relatives of the deceased have rights which the courts will protect." Potter, J., delivered an able opinion in that case, reviewing the matter both from the standpoint of history and of authority. In Larson v. Chase, 47 Minn. 307, it is held, that " the right to the possession of a dead body for the purposes of preservation and burial belongs, in the absence of any testamentary disposition, to the surviving husband or wife or next of kin. This right is one which the law recognizes and will protect, and for any infraction of it, — such as an unlawful mutilation of the remains, — an action for damages will lie. In such an action a recovery may be had for injury to the feelings and mental suffering resulting directly and proximately from the wrongful act, although no actual pecuniary damage is alleged or proved." In Bogert v. City of Indianapolis, 13 Ind. 135, it was held, that " The bodies of the dead belong to the surviving relatives, in the order of inheritance, as property, and they have the right to dispose of them as such, within restrictions analogous to those by which the disposition of other property may be regulated." In Renihan v. Wright, 125 Ind. 536, it was held that " Where a husband and wife employed undertakers to keep the body of a deceased daughter until they might be ready to inter it, and the defendants negligently took or allowed it to be taken and buried, or otherwise disposed of it, an action for damages would lie." In Doxtator v. Chicago & Western R. Co. (Michigan, 1899), 45 L. R. A. 535, a similar rule was recognized, but a recovery was denied on other grounds. See also 6 Am. L. Rev. 182; 8 Am. & Eng. Enc. Law (2d ed.), 835; Foley v. Phelps, 1 N. Y. Supr. Ct. App. Div. 551; Hackett v. Hackett, 18 R. I. 155, supra.

In this State the right of the owner of an easement of burial in a cemetery lot, or one who is rightfully in possession of it, to recover damages from a person who wrongfully enters upon it

and disinters the remains of persons buried therein, has been recognized; and it was held, that in a suit for wrongfully disinterring a dead body, if the injury has been wanton and malicious, or the result of gross negligence or a reckless disregard of the rights of others, equivalent to an intentional violation of them, exemplary damages may be awarded, in estimating which the injury to the natural feelings of the plaintiff may be taken into consideration. *Jacobus* v. *Congregation of the Children of Israel*, 107 *Ga.* 518; *Boumillot* v. *Gardner*, 113 *Ga.* 60. In *Wright* v. *Hollywood Cemetery Corporation*, 112 *Ga.* 884, it was held, that an unlawful and unwarranted interference with the exercise of the right of burial was a tort which gave to the grandmother and brother of the deceased, who were proceeding to have the corpse interred, a right of action; and the same ruling was made with respect to the damages recoverable as in the case of *Jacobus* v. *Congregation of the Children of Israel*, supra. From these decisions it will be seen that in Georgia, where ecclesiastical courts have never been recognized, rights with respect to burial, cemeteries, and dead bodies are protected by the secular courts. Indeed, if this were not so, and if all matters which were cognizable by the ecclesiastical courts, and thus withdrawn from the common-law administration, could not be dealt with by the courts of this State, many most important rights would be left unprotected. Thus, until a comparatively recent date, in England the jurisdiction of the ecclesiastical tribunals included, among other things, cases of marriage, divorce, and testamentary causes. In *Turner* v. *Thompson*, 58 *Ga.* 221, it is said, "Our own statute, which adopted the English common law and the old English statutes, adopted them only where applicable to our people in this new country, and the circumstances surrounding them here."

Some courts have quoted the statement from Blackstone set out above, and announced in broad language that a dead body is not the subject of property. But when particular cases arose, it generally became necessary to hold that a husband or wife, or next of kin, did have an interest in the body of the deceased, which the law would protect, whether that interest and the right of control and possession was technically denominated property, or quasi property, or by some other name. If this is not true, for stealing or wrongfully withholding the custody of a dead

body there might be an action for damages in some cases, but no method of recovering or restoring the body to its proper resting place. An illustration of the class of cases just referred to is Meagher *v.* Driscoll, 99 Mass. 281. This decision announced that a dead body was not the subject of property, and that after burial it became a part of the ground to which it had been committed. Yet, for an improper disinterring and removing of the remains it was held that an action of tort "in the nature of trespass quare clausum fregit" would lie, and if there was a wilful disregard or careless ignorance of the plaintiff's rights, the injury to his feelings might be considered in measuring damages. Nevertheless, the same court held, at a later date, that "an action against a hospital for an autopsy performed upon the dead body of a child without the consent of the father, who was the natural guardian, and who intrusted the child to the hospital for treatment, does not fail on the ground that there was no right of property in the dead body." In the decision the case of Meagher *v.* Driscoll is cited, not as conflicting with, but rather supporting the later adjudication. Burney *v.* Children's Hospital (Mass. 1897), 38 L. R. A. 413. If, then, there is a property right, or a quasi property right, in a dead body, subject of course to the necessity for proper disposition, and not to allow it to become a nuisance or injurious to the public welfare, what is the status of the defendant company which undertook to transport it for hire? In Hale *v.* Bonner, 82 Texas, 33, it was held, that a declaration by a widow against a railway company for negligence in the delivery of the body of her husband shipped upon such railway, causing delay in the funeral, by reason of which decomposition resulted, set out a cause of action. In Beam *v.* Cleveland Ry. Co., 97 Ill. App. 24, it was held, that "A brother of a deceased person, who undertakes to pay for the transportation of his body from the place of his death to that of his burial, has such an interest in the dead body as entitles him to damages for an injury to it by the negligent act of the railway while transporting it for hire." This was not a decision of the highest court of the State, but is nevertheless a decision which may be properly cited and considered. In Hockenhammer *v.* Lexington & Eastern Ry. Co. (Ky. App., 1903), 74 S. W. 222, a suit was brought against the railway company for striking with one of its trains a wagon containing the corpse of a child,

and throwing it to the ground. On the subject of the right of the father in regard to the corpse of his child, after citing various authorities, it is said, "We therefore conclude that the great weight of authority sustains the rule that there is a legal right in the bodies of the dead, which the courts will recognize and protect by the proper action, as the case may be." The recovery was denied on the ground that the petition did not allege any injury to the corpse. It was said, that if the child had been alive, and was simply thrown down, but not hurt, there could have been no recovery; and that a like rule would be applied, by analogy, to its body. See also Perley on Mortuary Law, 103.

Apparently conflicting with these various adjudications, in Griffith v. R. Co., 23 S. C. 25, it was held, that "An administrator has no property in the cadaver of his intestate, and therefore can not maintain an action for its wilful and negligent mutilation, but he may sue for injury to the wearing apparel of the deceased." In that case a man was murdered and his corpse placed on a railroad track to conceal the crime, and it was run over and mutilated by the trains. It also involved the review of a reversal by the judge of a referee's report, on the ground that the alleged negligence had not been proved. The direct ruling on the subject of property rights in regard to a dead body was, that the *administrator* had no such right. This was said to be "the precise point before us, i. e., the rights of the administrator," under the statute of South Carolina. In the course of the decision Simpson, C. J., makes use of the following language: "But can there not be a qualified property in the dead? one which gives control to some one with the view to protection, to decent interment, and to undisturbed repose, while they are dissolving and returning to the dust from which they were created? Can it be that there is no legal guardianship of the dead? And that when the life escapes the body is left, so far as the law is concerned, without protection, even from wanton and malicious depredation, and that those to whom it was bound in life by the tenderest of ties can invoke the aid of no court in preventing its mutilation? And must they resort to violence and force for this purpose? If such be the fact, it is a reproach to our judicial system, and one which calls earnestly for legislative interposition. And yet such seems to be the fact; at least the matter is left in great doubt, so far as our limited examination of the

cases, both in this country and in England, amid the press of our duties, has enabled us to ascertain. Certainly the administrator has no legal control or authority over the dead body of the person upon whose estate he has administered." We can not concur in this language as applicable to a husband or wife under the law of Georgia. The principle that for every right there shall be a remedy has been embodied in our code and adopted as statute law (Civil Code, §4929); although it was long before the adoption of our code announced by distinguished jurists. Pierce *v.* Proprietors of Swan Point Cemetery, 10 R. I. 240, supra.

In the present case it is not necessary to enter into a discussion as to whether the defendant could have been compelled or not to receive this corpse for transportation, or on what agreement. The plaintiff alleges that the defendant did receive it, and agreed to transport it for hire. Nor is it necessary to discuss the difference between carriers and common carriers, or whether railroad companies are generally common carriers of corpses, as argued in the brief of counsel for plaintiff in error. The declaration in effect alleged, that the plaintiff delivered the body of her husband to the defendant, a common carrier, to be carried from Atlanta to Warrenton, where it was to be buried; that she notified the defendant of this intention, and offered to pay for transportation between the two places; that defendant's agent at Atlanta refused to sell her transportation further than Camak, a junction, on its road, but informed her that the body would be carried by the defendant, and that she could buy transportation from Camak to Warrenton; that she paid the transportation to Camak; and that the defendant agreed to transport the body from Atlanta to Warrenton and accepted pay therefor. Under these allegations, it will be seen that it was not in contemplation either of the plaintiff or of the defendant that there should be a final delivery or removal of the body with its accompanying coffin and shroud at this junction, but its temporary stop there was merely to await the defendant's other train to the place of destination. It was not the intention of either party that the body should merely be shipped to Camak, and there stopped. Fairly construed the allegations of the declaration mean that the body was to be transported from Atlanta to Warrenton; that both parties so understood and agreed; that as a part of the through transporta-

tion between these two points payment was made to the junction, and that payment was to be made from that point on to Warrenton.   At Camak, the point of junction, therefore, the depositing of the coffin upon the defendant's platform did not constitute a final delivery to the plaintiff, which would exempt the defendant from all further duty or liability.   Plaintiff alleges that she offered to pay the entire transportation, and there is nothing to indicate that she was not ready to pay the second part of it, or that any act on her part changed the duty of the defendant.

It certainly can not be said by the defendant company that a corpse is sufficiently property for a railroad company to receive and accept pay for its transportation, but is not sufficiently property to authorize a recovery for a breach of duty arising therefrom, or to prevent any duty from arising under such circumstances.   If it received this body to be transported for hire, it was bound to discharge the duties arising from so doing, and for a failure to do so would be liable to an action.   We do not know what facts the evidence may establish upon the trial, but we hold that, under the allegations of the declaration, which, as against a demurrer, are to be taken as true, a cause of action was set out.   Civil Code, § 2279.   Not only negligence, but gross negligence, is alleged.   The demurrer, being general and not special, does not raise the direct question as to the measure of damages, or the extent to which there may be a recovery, if one is had.   We will, therefore, not discuss the measure of damages further than to say that this case does not fall within the ruling in *Chapman* v. *Western Union Telegraph Co.*, 88 *Ga.* 762, where it was sought to recover from a telegraph company damages on account of mental pain and suffering alone, alleged to have resulted to the plaintiff from failure of the company to deliver a message in due time.   Here the action is for a tort, and there is an allegation of actual pecuniary damage to the coffin and shroud, and of injury to the body. So that, as to this point, the case is quite similar to those of Meagher *v.* Driscoll, 99 Mass. supra, and *Jacobus* v. *Congregation of the Children of Israel*, 107 *Ga.* 518, supra.

*Judgment affirmed.   All the Justices concur, except Candler, J., absent.*