WESTERN UNION TELEGRAPH CO. *v.* TEAGUE ET AL.

[77. South. 302, In Banc.]

1. TELEGRAPHS AND TELEPHONES. *Failure to deliver message. Liability. Punitive damages.*
Where a telegraph company accepted a death message from the warden of the penitentiary to the mother of a deceased inmate, and charged an extra fee. for telephoning to the mother's home, it was liable for punitive damages for wilfully failing to send the message promptly by a rival line, when it learned that its own connecting telephone line had been removed, where its acts resulted in the mother being unable to see the body of her son or arrange for his burial.

2. DAMAGES. *Measure. Mental pain and suffering.*
Damages for mental pain and suffering cannot be awarded as a result of simple negligence, but in cases of wilful wrong, especially those affecting the liberty, character, reputation, personal security, or domestic relations of the injured party, a recovery for mental suffering is proper.

3. TELEGRAPHS AND TELEPHONES. *Failure to deliver message. Gross negligence. Question for jury.*
Where a telegraph company accepted a death message from the warden of the pententiary to the mother of a deceased inmate and charged an extra fee for telephoning to the mother's home, but failed to transmit such message promptly by a rival line upon learning that its own connecting telephone line had been removed. It was a question for the jury as to whether the company was guilty of such gross negligence as amounted to wilfulness.

4. TELEPHONES AND TELEGRAPHS. *Failure to deliver message. Liability.*
Where the failure to deliver a death message to the mother prompt-
117 Miss.—26

ly prevented her from seeing her son's body or arranging for his burial, this was an invasion of her rights, protected by law and if the result of a wilful wrong in failing to deliver such message, it warranted recovery of damages for mental suffering, though the issue of punitive damages was not submitted to the jury.

5. TELEGRAPHS AND TELEPHONES. *Failure to deliver message. Liability.*
When a telegraph company is guilty of wilful neglect the jury may not only bring in a verdict for punitive damages but may also assess damages for mental pain and suffering.

ON SUGGESTION OF ERROR.

6. TELEGRAPHS AND TELEPHONES. *Death message. Nondelivery. Mental suffering.*
Damages cannot be recovered against a telegraph company for mental pain and suffering for failure to deliver a death message where the telegraph company was not guilty of gross but only of simple negligence in failing to deliver such message.

APPEAL from the circuit court of Atala county.

HON. H. H. RODGERS, Judge.

Suit by Lucy Jane Teague and others against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals.

Appellee Lucy Jane Teague is the mother, and the other appellees are the next of kin, of Simon Teague, deceased. They instituted this suit against the Western Union Telegraph Company for the alleged negligent failure of the defendant company to deliver a telegram. Simon Teague, while an inmate of the state penitentiary at Nashville, Tenn., died of tuberculosis. The warden of the penitentiary thereupon filed with the Western Union Telegraph Company the following message, addressed to the mother, Lucy Jane Teague, at McAdams, Miss.:

"Simon Teague dead. What disposition shall we make of body? Answer."

This message was filed with the company at 4:55 p. m., Saturday, November 6, 1915, and was promptly transmitted over the wires of the Western Union to, and arrived at, Winona, Miss. about 5:17 p. m. as

shown by the face of the message. When the message was given the defendant company, the tariff book of the company showed that the Western Union Telegraph Company had connection with the little station of McAdams by telephone from Winona, and in receiving the message the company charged and received eighteen cents for the extra telephone service. The mother and relatives of Simon lived in sight of the railroad at McAdams station, and there is therefore no contention in this case that the sendee of the message was not known to the company or could not be found. The message was not forwarded from Winona to McAdams, either over the wire of the Western Union or the Cumberland Telephone Company, and the only delivery was by mail. The young lady who received the telegram at Winona testified that she called up the long-distance office of the Cumberland Telephone Company in an attempt to transmit the message from Winona to McAdams, but was advised that the Cumberland Telephone & Telegraph Company had discontinued service to McAdams. The agent then forwarded a service message to Nashville as follows:

"Undelivered. No phone connection at McAdams. Yours dated Lucy Jane Teague, signed Shaw. Will mail copy, best can be done."

She did mail a copy, but the copy did not reach appellee until Monday. In the books of the Western Union Telegraph Company McAdams was listed as a telephone station, and at the time the message was received at Nashville for transmission the record showed that delivery could be made from Winona over the line of the Cumberland Telephone & Telegraph Company. As a matter of fact, the arrangement between appellant and the Cumberland Telephone Company had been discontinued for about a year, but there had been no revision of the books to show this. There is evidence that the Postal Telegraph-Cable Company

had an office at Kosciusko, Miss., and direct telephone connection with McAdams over the Kosciusko Telephone Company, and that the Postal Company did a regular business at McAdams. In this way it is shown that the agent of the Western Union Telegraph Company could have promptly and easily transmitted the message from Winona through the Postal Telegraph Company. There was a store at McAdams and a telephone station there, from which messages could be sent to Kosciusko for delivery to the Postal Telegraph-Cable Company; and upon receipt of the mailed copy of message here complained of, appellee, who is an illiterate negro woman, requested Mr. Gowan, a white man and her employer, to transmit a message to C. C. Shaw, the warden at Nashville, and a telegram of inquiry was promptly transmitted to Nashville, and in response appellee received the following message, that was introduced in evidence:

"Nashville, Tenn. Lucy Jane Teague, Kosciusko, Miss.: The body of Simon Teague was held twenty-four hours, the time prescribed by law. Could ship body. Would incur extra expense of thirty-five dollars for embalming and for extra charges to your place. Send money if you desire body shipped. [Signed.]    C. C. SHAW."

It may be stated here that the testimony for the plaintiffs in the court below shows that Simon Teague had been desperately ill for some time; that his mother was in frequent communication with him; that she occasionally sent him money and food suitable for an invalid; that she was expecting his death from tuberculosis, and had requested the authorities of the penitentiary to notify her when her son died, so that the body could be shipped promptly; that she had saved from her meager earnings twenty-five dollars to defray the expense of shipment; and that this was all the money she had or was able to secure or borrow. When, therefore, she received the message from Nash-

ville that the extra expense for embalming would swell the charges to fifty-seven dollars she made application to her landlord and employer for the additional funds, but failed to raise the necessary money. The extra expense made the embalming and a belated shipment impossible. It appears that under the laws of Tennessee the dead body of a convict after twenty-four hours is turned over to the anatomical board and may be dissected.

The declaration of the plaintiffs sets out in detail the circumstances and relationship of the parties to the deceased, and charges that the failure of the defendant company to deliver the message was willful, wanton, oppressive, and the product of the grossest kind of negligence. The declaration further avers that the mother and next of kin of Simon Teague had the absolute right to the possession of the dead body, the right to select the burying place and to bury their deceased relative, the right to view his remains and to have conducted the funeral and all ceremonies incident thereto, that the nondelivery of the message operated to deny the enjoyment of these legal rights, and as a result of which plaintiffs suffered inconvenience, anxiety, mental pain, sorrow, and suffering. The case was tried by the court and jury, and resulted in a verdict for the plaintiffs in the sum of four hundred dollars, from which this appeal is prosecuted.

In submitting the cause to the jury the court refused to grant a peremptory charge in favor of the defendant, and gave several instructions in behalf of the plaintiffs, authorizing the recovery of "actual damages," and telling the jury that in estimating the actual damages they could take into consideration such damages as the jury might find from the evidence the plaintiff had suffered by reason of being deprived of the right to view the remains of Simon Teague, to prepare his body for burial, to select the place of

burial, and to bury the body. Instruction No. 1 for appellees is as follows:

"The court instructs the jury for the plaintiff that if they find from the evidence that the defendant accepted for transmission and delivery the message mentioned in the declaration as a common carrier of information for hire, and that defendant negligently failed to transmit and deliver same to the plaintiff within a reasonable time, and that as a proximate cause the plaintiff was then and there and thereby deprived of her right as next of kin to view the remains of the said Simon Teague, and to prepare the same for burial, and to select the place for burial, and to bury the same, then your verdict should be in favor of the plaintiff, for such actual damages as proved by the evidence."

Appellant contends that the refusal of the court to grant a peremptory instruction and the granting of the several instructions for the plaintiffs constitute error.

*J. B. Harris* and *O. A. Luckett*, for appellant.

*Geo. L. Teat*, for appellee.

STEVENS, J., delivered the opinion of the court.

Appellee Lucy Jane Teague is the mother, and the other appellees are the next of kin, of Simon Teague, deceased. They instituted this suit against the Western Union Telegraph Company for the alleged negligent failure of the defendant company to deliver a telegram. Simon Teague, while an inmate of the state penitentiary at Nashville, Tenn., died of tuberculosis. The warden of the penitentiary thereupon filed with the Western Union Telegraph Company the following message, addressed to the mother, Lucy Jane Teague, at McAdams, Miss.:

"Simon Teague dead. What disposition shall we make of body? Answer."

This message was filed with the company at 4:55 p. m., Saturday, November 6, 1915, and was promptly transmitted over the wires of the Western Union to, and arrived at, Winona, Miss., about 5:17 p. m., as shown by the face of the message. When the message was given the defendant company, the tariff book of the company showed that the Western Union Telegraph Company had connection with the little station of McAdams by telephone from Winona, and in receiving the message the company charged and received eighteen cents for the extra telephone service. The mother and relatives of Simon lived in sight of the railroad at McAdams station, and there is therefore no contention in this case that the sendee of the message was not known to the company or could not be found. The message was not forwarded from Winona to McAdams, either over the wire of the Western Union or the Cumberland Telephone Company, and the only delivery was by mail. The young lady who received the telegram at Winona testified that she called up the long-distance office of the Cumberland Telephone Company in an attempt to transmit the message from Winona to McAdams, but was advised that the Cumberland Telephone & Telegraph Company had discontinued service to McAdams. The agent then forwarded a service message to Nashville as follows:

"Undelivered. No phone connection at McAdams. Yours dated Lucy Jane Teague, signed Shaw. Will mail copy, best can be done."

She did mail a copy, but the copy did not reach appellee until Monday. In the books of the Western Union Telegraph Company McAdams was listed as a telephone station, and at the time the message was received at Nashville for transmission the record showed that delivery could be made from Winona over the line of the Cumberland Telephone & Telegraph Company. As a matter of fact, the arrangement between appellant and the Cumberland Telephone Com-

pany had been discontinued for about a year, but there had been no revision of the books to show this. There is evidence that the Postal Telegraph-Cable Company had an office at Kosciusko, Miss., and direct telephone connection with McAdams over the Kosciusko Tele-. phone Company, and that the Postal Company did a regular business at McAdams. In this way it is shown that the agent of the Western Union Telegraph Company could have promptly and easily transmitted the message from Winona through the Postal Telegraph Company. There was a store at McAdams and a telephone station there, from which messages could be sent to Kosciusko for delivery to the Postal Telegraph-Cable Company; and upon receipt of the mailed copy of message here complained of, appellee, who is an illiterate negro woman, requested Mr. Gowan, a white man and her employer, to transmit a message to C. C. Shaw, the warden at Nashville, and a telegram of inquiry was promptly transmitted to Nashville, and in response appellee received the following message, that was introduced in evidence:

"Nashville, Tenn. Lucy Jane Teague, Kosciusko, Miss.: The body of Simon Teague was held twenty-four hours, the time prescribed by law. Could ship body. Would incur extra expense of thirty-five dollars for embalming and for extra charges to your place. Send money if you desire body shipped. [Signed] C. C. Shaw."

It may be stated here that the testimony for the plaintiffs in the court below shows that Simon Teague had been desperately ill for some time; that his mother was in frequent communication with him; that she occasionally sent him money and food suitable for an invalid; that she was expecting his death from tuberculosis, and had requested the authorities of the penitentiary to notify her when her son died, so that the body could be shipped promptly; that she had saved from her meager earnings twenty-five dollars to defray

the expense of shipment; and that this was all the money she had or was able to secure or borrow. When, therefore, she received the message from Nashville that the extra expense for embalming would swell the charges to fifty-seven dollars she made application to her landlord and employer for the additional funds, but failed to raise the necessary money. The extra expense made the embalming and a belated shipment impossible. It appears that under the laws of Tennessee the dead body of a convict after twenty-four hours is turned over to the Anatomical Board and may be dissected.

The declaration of the plaintiffs sets out in detail the circumstances and relationship of the parties to the deceased, and charges that the failure of the defendant company to deliver the message was willful wanton, oppressive, and the product of the grossest kind of negligence. The declaration further avers that the mother and next of kin of Simon Teague had the absolute right to the possession of the dead body, the right to select the burying place and to bury their deceased relative, the right to view his remains and to have conducted the funeral and all ceremonies incident thereto, that the nondelivery of the message operated to deny the enjoyment of these legal rights, and as a result of which plaintiffs suffered inconvenience, anxiety, mental pain, sorrow, and suffering. The case was tried by the court and jury, and resulted in a verdict for the plaintiffs in the sum of four hundred dollars from which this appeal is prosecuted.

In submitting the cause to the jury the court refused to grant a peremptory charge in favor of the defendant, and gave several instructions in behalf of the plaintiffs, authorizing the recovery of "actual damages," and telling the jury that in estimating the actual damages they could take into consideration such damages as the jury might find from the evidence

the plaintiff had suffered by reason of being deprived of the right to view the remains of Simon Teague, to prepare his body for burial, to select the place of burial, and to bury the body. Instruction No. 1 well illustrated the basis of the plaintiff's alleged right to recover. This instruction reads:

"The court instructs the jury for the plaintiff that if they find from the evidence that the defendant accepted for transmission and delivery the message mentioned in the declaration as a common carrier of information for hire, and that defendant negligently failed to transmit and deliver same to the plaintiff within a reasonable time, and that as a proximate cause the plaintiff was then and there and thereby deprived of her right as next of kin to view the remains of the said Simon Teague, and to prepare the same for burial, and to select the place for burial, and to bury the same, then your verdict should be in favor of the plaintiff, for such actual damages as proved by the evidence."

Appellant contends that the refusal of the court to grant a peremptory instruction and the granting of the several instructions for the plaintiffs constitute error. It will avail little to discuss at length the legal *status* of a dead body. Under the English jurisprudence authority over the dead was originally intrusted to the ecclesiastical courts. The evolution of the law on this subject is shown in a most learned fashion in the report of Samuel B. Ruggles, referee—*In re Beekman Street,* 4 Bradf. Sur. (N. Y.) 503—where the right to preserve the remains and bury a corpse is held to be a legal right which the courts will recognize and protect, and that this right belongs exclusively to the next of kin. One of the leading cases in America is *Larson* v. *Chase,* 47 Minn. 307, 50 N. W. 238, 14 L. R. A. 85, 28 Am. St. Rep. 370, where it is said:

"This whole subject is only obscured and confused by discussing the question whether a corpse is property in the ordinary commercial sense, or whether it has any value as an article of traffic. The important fact is that the custodian of it has a legal right to its possession for the purposes of preservation and burial, and that any interference with that right, by mutilating or otherwise disturbing the body, is an actionable wrong."

It is said in the later Minnesota case of *Beaulieu* v. *Great Northern Railroad Co.,* 103 Minn. 47, 114 N. W. 353, 19 L. R. A. (N. S.) 564, 14 Ann. Cas. 462, that: "The rule laid down in the Larson Case expresses the modern view of the question, and extends a remedy where otherwise none would exist. There being no property in dead bodies, and the wrong complained of being only the invasion of an intangible legal right, no actual damages for the wrongful mutilation of the body can be recovered, and the courts award solatium for the bereavement of the next of kin as the only appropriate relief. Without the element of mental distress, the action would be impotent of results, and of no significance or value as a remedy for the tortious violation of the legal right of possession and preservation."

It was indeed held by a divided court in the case just quoted from that this rule had no application to actions for breach of contract, and for that reason the plaintiff, as against the railroad company in that case, was not permitted to recover. The present action is not an action for the breach of a contract, but is an action sounding in tort. The mother of the dead boy is here the sendee of the message. Appellant is a common carrier engaged in the business of transmitting intelligence by wire. Without a sendee of a message, there would be no message to send. Without a message to transmit, there would be no telegraph company. The essential purposes for which appellant

company is chartered and does business impose the duty of transmitting and delivering the message to the sendee and of performing this duty with reasonable diligence and accuracy. The facts of this case, in our judgment, would authorize the jury to inflict punitive damages.

We cannot say that the jury in this case allowed exemplary damages or regarded their verdict as in any wise a punishment. The plaintiff did not secure an instruction from the court expressly authorizing the jury to inflict punitive damages; but, on the contrary, instruction No. 6, granted the defendant, told the jury that they could not find punitive damages. Other instructions for the defendant advised the jury, also, that the plaintiff had no cause of action for "any damages arising from mental anguish or distress." The case was not tried upon a correct theory of the law, and the instructions given for both parties were not properly and legally grounded. The instructions for the plaintiff did not state as a prerequisite for recovery that the jury must believe the negligence of the defendant was willful or wanton or oppressive, or even to the degree of gross negligence. They simply state that if the jury believe that as a result of the nondelivery of the telegram the legal rights of the plaintiff were violated—that is to say, the mother's legal right to the possession of the corpse, to view the remains, to select the last burying place, and to bury her dead boy—then plaintiff could recover such actual damages as the jury thought plaintiff had suffered. The proof does not show any loss to plaintiffs in terms of dollars and cents. The most that could be said in that regard is that plaintiff suffered inconvenience, the trouble and annoyance of attempting to borrow funds, and of sending an additional telegram.

There is evidence, however, tending to show that the mother had the greatest affection and solicitude

for her wayward boy, that she was in constant communication with him, that she expected his death, that she earnestly desired that his body be shipped back to the old burial ground for interment, that she had accumulated her small earnings for the express purpose of paying the necessary expense, and that she suffered greatly as a result of her inability to have the corpse shipped and decently buried. It is settled law in our state, based principally upon the rule in *Telegraph Co.* v. *Rogers,* 68 Miss. 748, 9 So. 823, 13 L. R. A. 859, 24 Am. St. Rep. 300, that damages for mental pain and suffering cannot be awarded as the result of simple negligence. But where there is a willful wrong, or "willful disregard of the rights of" the plaintiff, warranting the imposition of exemplary damages, the Rogers Case "has no application." *Telegraph Co.* v. *Watson,* 82 Miss. 101, 33 So. 76. Indeed, the opinion in the Rogers Case noted and preserved the distinction. It expressly held that "in cases of willful wrong, especially those affecting the liberty, character, reputation, personal security, or domestic relations of the injured party," there could be a recovery for mental suffering.

Under the facts in the present case, if the telegram had been delivered, the mother would have had possession of the corpse, and there would have been no suffering as a result of her failure to obtain possession of the corpse. It must be conceded, then, that the natural and proximate result of the failure of the telegraph company to deliver the telegram in this case was to deny to the plaintiffs the enjoyment of their legal rights. There is an attempt to answer this argument by the assertion that the telegraph company had nothing to do with the corpse, that it did not have possession of the corpse, that it did not mutilate the same, and that it did not deny the possession to any one. This argument begs the main

question.   It is true that appellant did not have pos-
session and did not mutilate.   Neither is the telegraph
company a party to a contract made by sender and
sendee of a commercial telegram; but the failure to
deliver a message in reference to an important business
matter frequently results, necessarily, in actual dam-
ages.   The main inquiry in this case is whether appel-
lant is guilty of such gross negligence from which
willfulness may be imputed.   The facts, in our opinion,
warrant the submission of this issue to the jury.   The
jurors, as reasonable men, might well conclude that ap-
pellant is here convicted of the grossest kind of negli-
gence, negligence so gross as to evince an absolute
ignoration of plaintiff's rights, negligence tantamount
to willfulness.   It is conclusively shown that the mes-
sage reached Winona promptly, and might have
promptly concluded its journey, if appellant company
had condescended to employ the agency of its com-
petitor, the Postal Telegraph-Cable Company.   The
evidence shows that it knowingly declined to send the
message on from Winona by means of the Postal
Company and the telephone line then being freely and al-
most daily used by the Postal from Kosciusko to
McAdams.   Its sole defense seems to be that its
friend and ally, the Cumberland Telephone & Tele-
graph Company, was no longer doing business at
McAdams, and for that reason alone appellant could
not perform its contract.   The operator at Nashville
accepted an extra charge of eighteen cents for the
telephone service from Winona.   In accepting the mes-
sage, then, the servants of appellant knew that the
Western Union wire did not run to McAdams. With
this knowledge, it undertook for extra compensation
to put the message into McAdams.   The proof shows
that it could have done so by engaging the services
of the Postal Telegraph Company.   Its response to
this cause of action then is:

"I could not perform, because I could not afford to let my competitor have a part of the small compensation here collected for this service."

This does not amount to exoneration. It is rather an admission of a default knowingly permitted. This was a message, of extraordinary interest to the sendee and the sendee's family. The message on its face gave notice of death and the inquiry as to what disposition is to be made of a corpse. Its urgency was obvious to the company. The jury, then, would be justified in inflicting punitive damages.

But it is suggested that the case should be reversed, and judgment entered here, because the plaintiff did not have the issue of punitive damages submitted. We do not think appellant is in a position to make this contention. There must be a common-sense rule in the administration of justice. We do not believe it is radical to hold that the legal rights of the mother and next of kin have been violated. If these intangible legal rights have been invaded, and this as the result of the willful wrong of the defendant, a recovery of damages for mental suffering should be permitted. It will profit little to discuss the question whether the allowance for mental suffering would be compensatory or punitive. The plaintiff, we think, had the right in this case to submit the issue of punitive damages to the jury, and in connection therewith and as a part thereof to claim damages for mental suffering, because the act complained of grows out of a right protected by the law. It is stated by Mr. Hale in his work on Damages (Hornbook Series):

"While compensation for mental suffering alone cannot be recovered, where the same act that causes mental suffering also injuries plaintiff in respect to a right protected by law, as in regard to his person, property, or reputation, the law, in redressing such injury, will also award to plaintiff a suitable compensation for his mental suffering, considered as an

inseparable part of the general result of the tort against him." Page 155. "For breach of an undertaker's contract to keep safely the body of plaintiff's deceased child, it was held that damages could be recovered for mental anguish. So, too, where there was a breach of contract to bury a child in a proper manner, damages for mental anguish were allowed. Damages for mental anguish have also been allowed for breach of contract to transport a corpse"—referring to cases in the footnotes, page 163.

The cases cited by Mr. Hale go further, perhaps than our court has ever gone, or than it is necessary to go in this case. As stated, this is not an action for the breach of a contract but for a willful tort. Recovery in such cases has always been allowed in Mississippi. *Alabama & V. R. Co.* v. *Hanes,* 69 Miss. 160, 13 So. 246; *Heirn* v. *McCaughan,* 32 Miss. 17, 66 Am. Dec. 588; *New Orleans, J. & G. N. R. Co.* v. *Hurst,* 36 Miss. 660, 74 Am. Dec. 785; *Magouirk* v. *Telegraph Co.,* 79 Miss. 632, 31 So. 206, 89 Am. St. Rep. 663; *Telegraph Co.* v. *Watson, supra; Hartzog* v. *Telegraph Co.,* 34 So. 361; *Railroad Co.* v. *Hawkins,* 74 So. 775, L. R. A. 1917D, p. 977. In the last-named case there was a willful neglect of duty by a carrier to its passenger, Miss Hawkins, and a recovery for mental pain and suffering. The opinion concludes:

"The case being one that justifies the infliction of exemplary damages, recovery for mental pain and suffering shown by the evidence was proper"—citing numerous authorities.

There is no decision of our court in which a recovery of damages for mental suffering has been denied, where there was gross negligence tantamount to willfulness. There are cases in which recovery of punitive damages and damages for mental suffering were denied, but they are differentiated on the facts. The case of *Telegraph Co.* v. *Koonce,* 72 So. 839, is one of the cases where the court upon the facts held

that the infliction of punitive damages was not justified. So, also, in the case of *Telegraph Co.* v. *Spratley,* 84 Miss. 86, 36 So. 188. The degree of negligence is again commented upon by the court in *Telegraph Co.* v. *Ragsdale,* 111 Miss. 550, 71 So. 818. In the last-named case the court, by HOLDEN, J., says:

"Nor can he recover for such mental pain and suffering in the instant case as a part of punitory damages, because the facts are not such as justify the infliction of punitive damages."

The present case in its essential features is akin to that of *Hartzog* v. *Western Union Telegraph Co., supra.* In the Hartzog Case the declaration charges willful negligence and failure to transmit and deliver a message, as a consequence of which plaintiff was denied his right to see his dead sister and to attend her funeral, which failure resulted in mental pain and anguish. There was no actual damage in terms of dollars and cents alleged or shown. The court, by WHITFIELD, Chief Justice, held that:

"The case of *Betsy Watson* v. *Western Union Telegraph Co.,* 33 So. 76, controls this case."

Recovery for gross negligence is sanctioned, also, in the case of *Steinberger* v. *Telegraph Co.,* 97 Miss. 260, 52 So. 691, the decision of which was recently approved in *Johnson* v. *Western Union Telegraph Co.,* 76 So. 738.

The kind of mental suffering here sued for is not something visionary, or the product of too sensitive a mind. The right of the appellee to take possession of the dead body of a member of her family, to have a funeral service according to the highest expressions of a Christian civilization, and to control the place of interment, are sacred rights. Society, and indeed the government, is founded upon the home, and the ties that bind members of the family circle one to the other are indeed blessed. The plaintiffs, then, were within the law in attempting to have the body of Simon Teague shipped and interred,

117 Miss.—27

and the natural consequences of appellant's gross negligence in this case produced the kind of suffering which any family would experience whose circle is broken by death. In the Ruggles report, frequently quoted with approval, it is said:

"The establishment of a right so sacred and precious, ought not to need any judicial precedent. Our courts of justice should place it, at once, where it should fundamentally rest forever, on the deepest and most unerring instincts of human nature, and hold it to be a self-evident right of humanity, entitled to legal protection, by every consideration of feeling, decency, and Christian duty."

There are numerous states that have adopted the so-called "Texas doctrine" and freely allow damages for mental pain and anguish for failure to deliver a telegram. These cases we do not refer to for the obvious reason that our court has declined to follow the Texas rule on this subject. We still adhere to that rule, but in doing so we do not understand that our court has ever gone to the extent of denying relief in a suit of this kind, sounding in tort and reflecting a willful ignoration and disregard of lawful rights.

The case must be reversed, because the law was not properly given in charge to the jury. The jury should determine ordinarily the degree of negligence, and the question whether the facts of this case constitute gross negligence from which willfulness will be inferred is a question the jury should answer under proper instructions from the court. If the jury believe from all the facts that appellant is guilty of willful neglect, then under proper instructions they may not only bring in a verdict for punitive damages, but may also assess damages for the mental pain and suffering experienced by the plaintiff. Surely in a case of willful neglect the defendant carrier will not be heard to say that the plaintiff's demand is ethereal, visionary, or speculative, especially when intangible legal rights are violated.

*Reversed and remanded.*

SMITH, C. J. (concurring). I concur in the reversal of the judgment of the court below, on the ground that appellant's request for a peremptory instruction should have been granted, the evidence, in my judgment, not warranting a jury in finding that the delay in the delivery of the telegram was the result of either willfulness, wantonness, or such gross negligence as is tantamount thereto, on the part of appellant's employees.

I am requested by my Brother SYKES to say that he is of the same opinion.

#### ON SUGGESTION OF ERROR.

PER CURIAM. The judgment of the court below was reversed on a former day, and the cause remanded. Judges ETHRIDGE, HOLDEN, STEVENS and COOK were of the opinion that the granting of appellees' first instruction, which permitted her to recover for mental anguish resulting from simple negligence, was error, but that appellant's request for a peremptory instruction was properly refused, for the reason that the jury would have been warranted in finding that appellant had willfully and wantonly disregarded appellees' rights and could have awarded her punitive damages therefor, in which damages for mental anguish could have been included. Judges SYKES and SMITH concurred in the reversal, on the ground that appellant's request for a peremptory instruction should have been given, for the reason that the evidence will not, in their judgment, warrant a finding by the jury that the delay in the delivery of the telegram was the result of either willfulness or wantonness, or of such negligence as is tantamount thereto.

On a reconsideration of the cause, Judge ETHRIDGE, HOLDEN, and STEVENS adhere to their former opinion; and Judges SYKES and SMITH, while agreeing that the granting of appellees' first instruction was error, adhere to their former opinion that the cause should be reversed because of the refusal by the court to grant appellant's

request for a peremptory instruction, in which opinion Judge COOK now concurs. So that on the question of whether or not that instruction should have been given the court is equally divided. All of us agree that the court below erred in granting appellees' first instruction, so that we committed no error in reversing the judgment; but the opinion hereinbefore rendered will be withdrawn.

*Overruled.*

ETHRIDGE, J. I concur in the overruling of the suggestion of error and in the remanding of the cause for a new trial. The suggestion of error vigorously assails the statement of facts in the opinion of the majority of the court rendered upon the hearing of this cause, and contends that the court must have misunderstood the facts in the record. The record was in the consultation room for a long time prior to the first decision, and I read it thoroughly, and think every member of the court did, and, on account of the differences of views, the case was thoroughly considered, both as to the law and the facts, by each member of the court. On the filing of the suggestion of error I carefully re-read the record and the opinion of Judge STEVENS, and find that the facts stated by Judge STEVENS in the former opinion fairly present the record in this case. While the former opinion rendered by Judge STEVENS is set aside, because, on this suggestion of error, it represents the views of one-half of the members of this court now, I desire to reaffirm my fullest concurrence in this opinion both as to the law and the facts. The telegraph company in the trial produced a number of witnesses in its behalf dealing with the telegram in question, and each undertakes to say that it was not his duty to see to the routing of the telegram, nor to take it up with any other agency by which it could have been transmitted. Some of the witnesses so produced testified that the person whose duty it was to see to the routing

of the telegram was the person who received the telegram at the counter, which person was not produced.

It is perfectly apparent, from the record in this case, that if the telegraph company at Winona had called Kosciusko, to which office it formerly delivered messages to McAdams, and had made proper inquiry for connections with McAdams, the telegram could have been promptly delivered on the date on which it was sent. It is further perfectly apparent from the record that when the service telegram was returned to Nashville, informing the receiving office that the telegram was not delivered and that the Western Union's connection with McAdams had been discontinued, the telegraph company could then have delivered the telegram over the lines of the Postal, and if this had been done the message would have been promptly received by the sendee, and all trouble avoided. On receipt of the service telegram at Nashville, informing that office that the Winona office could not deliver over the wires of the Western Union, some operator of the telegraph company called Mr. Thomas, night turnkey of the Tennessee State Penitentiary, and he was informed that it could not be delivered by wire over the Western Union, but could only be delivered by mail, and he says:

"They said they could not deliver the message that night only by messenger, and I replied that the warden was not in the office just at that time, and I told them that I would call his attention to it. I also told them that the warden, of course, wanted the message delivered, or he would not have sent it. But I would not assume the responsibility of the message."

It does not appear anywhere in the record that any further effort was made by the telegraph company to deliver the telegram, nor was there any further effort to get in touch with the warden, who sent the message, to see whether he wanted it sent over the Postal or not. There can be no question in my opinion of this dereliction of duty being negligence amounting to wan-

tonness and a disregard of the rights of the sendee in this important death message, showing on its face that the warden was requesting information and instruction as to the disposition of a dead body, which under the law (which the telegraph company must know) would be turned over to the anatomical board and dissected, and by such dissection that the sendee would be deprived of her rights as to the custody and disposition of the dead body.

In the case of *Western Union Telegraph Co.* v. *Jones,* 69 Miss. 658, 13 So. 471, 30 Am. St. Rep. 579, this court held that it is within the scope of the operator's agency to know to what places messages can be sent, and if he receives a message for a place through which the company's lines run, and accepts pay therefor, agreeing to send it, the company will be liable for failure to transmit it, although it has no office in and does no business at such place. In this case a message was delivered to the Western Union Telegraph Company at Jackson, Miss., for transmission to Clinton, Miss. containing the following:

"Ella died last night. Send wagon. Have grave dug."

Ella was the daughter of the sender of the telegram and the telegram was addressed to the sender's sister. The company undertook to deliver by phone after finding that it had no office at Clinton; but the phone message was not delivered, and expenses were incurred in reference to the burial of the deceased amounting to sixteen dollars. There was a verdict in this case for fifty dollars and forty cents, and this judgment was affirmed by this court. It was then clearly the duty of the telegraph company, having accepted the message for delivery, to use every reasonable means at its command to make delivery.

It is not a question here of liability that would have resulted, had the company refused to accept the message for transmission; but it is a case here where the com-

pany, having accepted the message for transmission and having been paid the fee therefor, as to whether it could refuse and neglect to send the message, by refusing to use a public agency engaged in, and charged with the duty of, transmitting all messages tendered, and escape liability for such failure. Clearly it could not. It was in duty bound, on finding its own office disconnected at McAdams, to tender the message to the Postal Telegraph Company, or some other agency which could deliver the message to McAdams. It affirmatively appears that the Postal Telegraph Company had an office at Nashville, Tenn., and also one at Kosciusko, Miss., and if this message had been tendered to that company at either place it would have been transmitted and delivered promptly.

But little was said in the former opinion upon the question of actual damages, but the opinion does hold that actual damages are recoverable. Not only did the plaintiff have the right to the custody of the body, to provide for its burial, and to select a place therefor, but the sendee was inconvenienced in making efforts to raise the necessary money to procure the shipment of the body from Nashville to her; all of which are items of compensatory damage. In the case of *Cumberland Telephone & Telegraph Co. v. Hobart,* 89 Miss. 252, 42 So. 349, 119 Am. St. Rep. 702, this court held that inconvenience was an element of compensatory damages, and upheld a verdict for one hundred and fifty dollars based upon the inconvenience of being without a phone, which the telephone company wrongfully refused to install. On page 260 of the Mississippi report of this case (42 So. 350, 119 Am. St. Rep. 702) the court, speaking through Justice MAYES, said:

"The jury in this case allowed the sum of one hundred and fifty dollars, and we cannot say that their judgment was wrong in this matter. The law of damages, and what is proper to be allowed, must largely depend upon the nature of the suit in which damage

is sought to be recovered. It was impossible for Ho-
bart to itemize each separate item of damage occasioned
him by the removal of his telephone.    The difficulty in
doing this is manifest to every one.    The telephone has
come to be a necessity.    It is the thing which completes
the use of a home.    It is resorted to daily, and hourly,
to such an extent as to be regarded as indispensable;
yet, when it comes to taking pencil and paper and cal-
culating day by day what pecuniary value it possesses,
it is almost impossible.    The inconvenience, the annoy-
ance, and the trouble of being without one is a dam-
age which no one can accurately estimate.    It is such
inconvenience and annoyance as is only to be fully ap-
preciated when one is deprived of its use; its loss is
a great and distinct damage, yet such damage as is not
susceptible of exact measurement.    When the telephone
company undertook to cut out the residence telephone
because of the nonpayment of rent, Hobart was in de-
fault, and it had the right to do it.    When appellant
declined to reinstate it after having been offered the
rental of the telephone in the dwelling house, it was
its duty to reinstate it, and, not having done so, it should
compensate Hobart for his pecuniary loss, and such in-
convenience and annoyance in being wrongfully de-
prived of its use, as the jury thought proper under the
fact.''

In the case of *Hewlett* v. *George*, 68 Miss. 703, 9 So.
885, 13 L. R. A. 682, this court held that compensatory
damages are not necessarily limited to actual money
losses; that for an unlawful incarceration of plaintiff
by defendant in an insane asylum compensation may be
had, not only for money expended in procuring the re-
lease, but for the consequent humiliation, shame, disgrace,
and injury to reputation.    Compensation for these, not
being punitive damages, may be recovered after the
death of the defendant from his personal representative.
In discussing this case Justice Woods, speaking for the
court, said:

"Surely these injuries were real ones, and compensation for these would have been an award for actual damages. Compensatory and actual damages are one, and compensation for wrongs done to one's character is, in no sense, punitory. We cannot consent that actual damages, in this case, must be confined to the few dollars and cents shown to have been expended by plaintiff to secure her release from the asylum, and that no compensatory damages were awardable for shame and anguish and hurt to character."

This court is fully committed to the doctrine that damages for mental anguish, alone, will not be awarded where there is mere negligence, but to warrant damages for mental anguish the negligence must be willful or wanton, or must be such a disregard of the plaintiff's rights as to amount to wantonness. The instruction, as pointed out in the main opinion on this suggestion, was erroneous, under the decisions of this court, in allowing compensatory damages for mental anguish for simple negligence. However, compensatory damages can, and should, be allowed for the wrongful withholding of the body, resulting from the neglect to send this telegram, and for the consequent inconvenience and trouble resulting from such neglect, even if this negligence is simple negligence, and not gross negligence. In the case of *Steinberger* v. *Western Union Telegraph Co.,* 97 Miss. 260, 52 So. 691, this court held that the failure to transmit a message, where the failure was unexplained, amounted to gross negligence, and authorized the recovery of punitory damages. In that case no effort to explain was made at all, while in this case the party whose duty it was to see to the routing of the telegram was not produced and did not testify in exoneration of the company. It does not seem to me that, where the company has the witness by whom it could explain its default, it can escape being charged with gross negligence by the producing of somebody who had no duty in routing the telegram. It was certainly the business of

some officer of the telegraph company to know to what points it had offices and at what points it had connections; and from the testimony in this record the person who is charged with that duty and that knowledge was not produced at all.

While at common law in ancient times the dead body was not regarded as property, and while the rights and dispositions of such bodies was intrusted to the ecclesiastical courts, this rule has never prevailed in its full extent in America, and modern authorities have abandoned that doctrine, and practically all of the authorities agree that, where a dead body is injured or mutilated, the next of kin, having the right to such body for disposition and burial, may recover damages. Some place the right to recover upon one principle, and some upon another; but all recognize the rights of the next of kin, and award compensation for any invasion or injury of such rights. In the case of *Louisville & Nashville R. R. Co.* v. *Wilson,* 123 Ga. 62, 51 S. E. 24, 3 Ann. Cas. 128, 2 Am. Ruling Cases, 1164, Judge LUMPKIN, speaking for the Georgia court in discussing the rights in reference to dead bodies and for injuries thereto, uses the following language:

"Death' is unique. It is unlike aught else in its certainty and its incidents. A corpse in some respects is the strangest thing on earth. A man who but yesterday breathed and thought and walked among us has passed away. Something has gone. The body is left still and cold, and is all that is visible to mortal eye of the man we knew. Around it cling love and memory. Beyond it may reach hope. It must be laid away. And the law—that rule of action which touches all human things—must touch also this thing of death. It is not surprising that the law relating to this mystery of what death leaves behind cannot be precisely brought within the letter of all the rules regarding corn, lumber, and pig iron. And yet the body must be buried or disposed of. If buried, it must be carried to the place of burial. And the law, in its all-sufficiency, must furnish

some rule, by legislative enactment, or analogy, or based on some sound legal principle, by which to determine, between the living, questions of the disposition of the dead and rights surrounding their bodies. In doing this, the courts will not close their eyes to the customs and necessities of civilization in dealing with the dead, and those sentiments connected with decently disposing of the remains of the departed which furnish one ground of difference between men and brutes."

In this case the court held the railroad company liable for its negligence in holding and dealing with the dead body and injury to the coffin and burial materials. The learning on the subject of dead bodies is extensive and is well collected in 2 Am. Ruling Cases Annotated, and notes appending to such cases in this series, and especially the case note beginning at page 1141, annotating the case of *Pettigrew* v. *Pettigrew*, 207 Pa. 313, 56 Atl. 878, 64 L. R. A. 179, 99 Am. St. Rep. 795. It is inconceivable to my mind that a right so valued and so sacred to all human beings cannot be regarded as the subject of compensatory damages. In all the ages known to present history the burial of the dead has been held a valuable and sacred privilege. Defending the resting places of the dead has inspired countless armies to valor, has nerved and strengthened the courage of the hero, and has been the theme of the orator and poet.

> "Then out spake brave Horatius,
> The captain of the gate:
> 'To. every man upon this earth
> Death cometh soon or late;
> And how can man die better
> Than facing fearful odds
> For the ashes of his fathers
> And the temples of his gods?'"

In the war songs of every nation we find reference to the resting place and ashes of their dead. What is the value to a parent of a dead body of the son? What

man or woman having a son, receiving a message similar to the one in this case, would not count out the last coin in their possession to have the body brought home for the final honors and ministrations to the dead? Ask the fathers and mothers in this land, who have sons in the trench-scarred hills of France fighting for the cause of liberty, what they would give, in case their son should be killed, to have his body returned home, to be placed with the family dead, rather than to lie in forgotten graves by some inland river on a foreign soil, "under the sod and dew, awaiting judgment day," where they could not have the privilege and consolation of visiting the graves and doing the customary honors and reverences to the dead. Surely this is one of the rights that people have that is valuable and worthy of the protection of the courts and of the law. But if we even disregard all sentiment and affection and human attributes that clusted around the right to bury the dead and be with the dead bodies, and if we descend to the lowest depths of damnable dollarism and place only the value the dead body would bring if offered for sale, we find in modern times that the body is valuable and will even bring money when offered to medical colleges and other scientific institutions to be offered upon the altar of science. There is no standpoint from which we can regard the subject, but which there are rights and value, and it is impossible for me to believe, in this enlightened age, that, where a person is deprived of the custody of the dead, there can be no compensation for the neglect, even though it be simple neglect, of a person or corporation whose wrongful acts result in depriving the next of kin of their sacred rights.