(48 App. Div. 248.)

PEOPLE ex rel. MANHATTAN RY. CO. v. BARKER et al., Commissioners.

(Supreme Court, Appellate Division, First Department. February 23, 1900.)

1. TAXATION—ASSESSMENT—ELEVATED RAILROAD PROPERTY.
    In determining the actual cost of an elevated railroad structure for the purposes of taxation, interest on the sum required to replace it during the period of construction is an essential element of cost, and should be added to the cost of replacing it.

2. SAME—DEBTS DUE RAILROAD COMPANY.
    A merger agreement between the relator, an elevated railway company, and another company, provided that the relator should assume and pay all debts and liabilities against the other company, and should be entitled to so much of its property as should equal the amount paid. The relator expended money for the benefit of the other company in improving its property, and paid judgments against it for appropriating easements of abutting property owners, and for obtaining a conveyance of such easements. The total amount so paid was charged to the other company, and constituted a lien on its property until the merger was completed. *Held*, that the entire amount paid was properly assessable for taxes against the relator until the merger was completed.

3. SAME—DAMAGES—PAYMENT.
    Where an elevated railway company pays damages sustained by the owners of property abutting on streets on which its structure is built, such payment does not result in the acquisition of property, but merely discharges a legal liability, and hence is not taxable.

4. SAME—EASEMENTS.
    Easements acquired by an elevated railway company from owners of property abutting on the street on which its road is built are property, and hence assessable for taxes against the company.

5. SAME—DEDUCTIBLE INDEBTEDNESS.
    Where the proceeds of bonds issued by an elevated railway company were paid for the general purposes of the company, and not for the purpose of purchasing franchises of another company, such bonds are deductible indebtedness in the assessment of the company's property for taxes.

6. SAME.
    Where the relator, an elevated railway company, became liable under a merger agreement with another company for the payment of bonds issued by the other company for the erection of its railroad structure, which became the relator's property on the completion of the merger agreement, such bonds were deductible indebtedness in assessing the relator's property for taxes.

7. SAME.
    Where judgments are rendered against an elevated railroad company in actions by property owners for trespass on their property in a street, such judgments, so far as they are for damages for the trespass, and not for the acquisition of easements in the street, are deductible indebtedness in assessing the company's property for taxes.

8. SAME—REVIEW.
    In reviewing an assessment of property for taxation, the court is bound by specific testimony as to its value at the time of the easement, rather than by admissions of the owner as to the cost of the property many years before.

Appeal from special term, New York county.

Certiorari to review assessment for taxes by the people, on the relation of the Manhattan Railway Company, against Edward P. Barker and others, as commissioners of taxes and assessments. From an order of the special term (59 N. Y. Supp. 926), confirming the assessment and dismissing the writ, the relator appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Julien T. Davies, for appellant.
William L. Turner and James M. Ward, for respondents.

INGRAHAM, J. The respondents, the commissioners of taxes and assessments of the city of New York, originally assessed the property of the relator, for the purpose of taxation for the year 1894, at $30,000,000. The relator objected to this assessment, and appeared before the commissioners, who reduced it to $17,860,712. The relator thereupon commenced a proceeding by certiorari to review this assessment, and upon this proceeding the special term set aside the said assessment, but, upon appeal to the late general term of this court, the order of the special term was reversed, and the assessment confirmed. Upon an appeal to the court of appeals, the order of the general term was reversed, and a reassessment was

ordered. 146 N. Y. 304, 40 N. E. 996. The commissioners there-upon proceeded to make such reassessment, and on December 19, 1895, reassessed the property of the relator, subject to taxation for the year 1894, at $16,609,638. The relator then applied to the commissioners for a reassessment, upon which application the capital stock and surplus profits of the relator for the year 1894 were reappraised and reassessed at the sum of $15,526,800. The relator then commenced proceedings to review the action of the commissioners, and it was referred to a referee to take and report the evidence offered by the respective parties, with his opinion thereon. The referee reported the evidence taken before him, and his conclusion that the aforesaid reassessment of the capital stock and surplus of the relator for the year 1894 was erroneous and illegal, and should be wholly vacated and set aside and stricken from the assessment roll. The proceeding upon the referee's report and the return was brought on for hearing at special term, when the court, finding certain facts, confirmed the assessment and dismissed the proceeding, and it is an appeal from the order entered on that application that is now before us.

The question before this court at special term, and which is now before us on appeal, is wholly a question of fact, and involves two questions: First, the value of the property of the relator which is subject to taxation; and, second, the amount of the relator's indebtedness which the respondents were bound to deduct from the total value of the relator's property subject to taxation, in ascertaining the amount of the assessment upon which the relator should be taxed. The relator owns and operates an elevated railroad in the city of New York, and in the operation of its road it earned during the year 1894 an amount sufficient to pay interest upon all its indebtedness, aggregating many million dollars, and also 6 per cent. upon its capital stock, aggregating nearly $30,000,000, and was able to accumulate a surplus of $1,000,000. The market value of this stock was $122 per share, making its value about $36,000,000. And yet in the face of these facts, by the report of the referee and excluding the franchise of the company, the corporation is insolvent. Under the law in relation to taxation, however, what we have to do is to ascertain and fix the fair value of the capital which the law makes subject to taxation, deducting therefrom the amounts directed to be deducted, and thus fix an amount upon which the relator is liable to be taxed.

The referee found that upon the second Monday of January, 1894, the property of the Manhattan Railway Company assessable for the purposes of local taxation consisted of the following items.

| | |
|---|---:|
| Structure of the railroad, including its foundations or beds and superstructure | $ 8,770,587 00 |
| Real estate, other than the railway proper | 5,120,216 00 |
| New York equipment, rolling stock, etc | 2,213,602 59 |
| Suburban equipment, rolling stock, etc | 142,175 13 |
| Cash | 1,382,838 00 |
| Tools and machinery | 381,538 09 |
| Open accounts | 2,023,487 57 |
| Making a total of | $20,034,444 38 |

The court below added certain open accounts, which it held were property of the relator, amounting to $4,194,452.13; and also the sum of $8,814,423.33, the amount paid by the Manhattan Railway Company for fee and rental damage to abutting owners along the streets on which the relator operated its lines of elevated railroad within the city and county of New York,—fixing, as the total value of the property of the relator subject to taxation, $33,044,319.84. The referee had deducted the assessed value of all the relator's real estate, which on January 8, 1894, was $7,323,200, and upon which it had paid taxes; and also its total indebtedness, represented by certain bonds, aggregating $21,163,035,—which two sums exceed in amount the value of the relator's property found by the referee to be assessable for taxation. The main question before us, therefore, is as to the right of the respondents to include in the assessment of the property of the relator subject to taxation the amount of these open accounts which were deducted by the referee and the amount paid by the relator for land damages, and as to the right of the relator to deduct the whole amount of its bonded indebtedness from the amount of its property subject to be taxed.

This proceeding was instituted under chapter 269, Laws 1880, and "we have a writ of certiorari with novel functions, hitherto unknown to such methods of review. * * * The petition is regarded as the complaint, the return as the answer, and, in deciding the issues joined thereby, the court may call witnesses to its aid, and their testimony becomes a part of the proceedings upon which the determination of the court is to be made. That determination is a revaluation, and it may be a different valuation of the property assessed. * * * In other words, it was the duty of the court to retry the questions of fact, and decide them over again, and, whether its findings were written out or left to necessary implication, there is no escaping the conclusion that the facts are conclusively presumed to have been decided de novo. * * * Thus, the writ under consideration may be a writ of review merely, and hence properly called a writ of certiorari, and it may be in the nature of a venire de novo, and utterly foreign in function to the writ of certiorari as known in the history of the law." People v. Barker, 152 N. Y. 431, 46 N. E. 875. In this proceeding, therefore, it is the duty of the court upon the writ and the return thereto, including the proceedings before the tax commissioners and the evidence taken before the referee, to determine whether the tax commissioners applied a correct method in making the assessment, and, if not, to make a new appraisement, and ascertain and fix the amount of the relator's property subject to taxation.

It was conceded by both parties that the method adopted by the tax commissioners in arriving at the amount of the relator's taxable property was erroneous, and it became necessary, therefore, to ascertain the correct principle upon which the property was to be assessed, and, applying such principle, to make a reassessment. Upon the former appeal in this proceeding, it was held that it is the actual value of the capital stock, and not the market value of its share stock, that is to be assessed,—in other words, that it is the

actual, tangible personal property, and not its franchises,—and that property is to be assessed "at the sum for which such property, under ordinary circumstances, would sell. The value of the property is determined by what it can be bought and sold for, and there can be no doubt but that these various expressions used in the statutes all are intended to mean the actual value of the property." 146 N. Y. 312, 40 N. E. 998.

In the first place, therefore, we have to determine the actual value of the property of the corporation subject to taxation. In the evidence before the referee the property of the relator subject to taxation is stated in detail and the actual value given. That property consisted, first, of an elevated railroad constructed of iron, in the public streets, in the city of New York. There was in evidence before the referee its cost when built, and certain reports of the relator made to the railroad commissioners, and evidence was also introduced to show how much it would at present cost to recon struct it. The referee found upon the evidence, and such finding, we think, is sustained, that the cost of replacing this structure would be $8,770,587. This was objected to by the respondents upon several grounds. The only one which requires consideration is that there was not added to this amount the interest upon the amount expended during construction, which was a necessary element of the cost. We are inclined to think that this contention is correct. To reproduce the structure would require considerable time, and during that period the structure would have no earning power, but the money expended would be idle, and during the period of construction interest would have to be paid upon it. Assuming, as claimed by the respondents, that interest upon this sum should be charged for an average period of two years before this road would be in condition to be operated, there should be added to this amount interest for the period named. Six per cent. upon this cost for two years would amount to $1,052,470, and the value of the structure of the relator should be increased by that amount, and should be made $9,823,057.

The next item of property is the real estate other than the structure, the value of which was fixed by the referee at $5,120,216, and that value was not objected to. The referee also found that the relator had the following property:

New York equipment, valued at............................. $2,213,602 59
Suburban equipment,     "       " ............................... 142,175 13
Cash ................................................... 1,382,838 09

He also found that the relator had an open account amounting to $2,023,487.57 against the Metropolitan Railroad Company. The respondents claim that this open account should be $6,217,929.79. It appeared in relation to this open account that by a lease made the 20th of May, 1879, the relator leased its railway from the Metropolitan Company. In that lease the relator undertook to keep the railway and premises demised in thorough repair, working order, and condition; but there was no provision by which the Metropolitan Company should be responsible for any expenditures made by the relator upon the railway, or in paying any obligation of the

Metropolitan Company. By what was called a "tripartite agreement," dated August 1, 1884, between the New York, the Metropolitan, and the Manhattan 'Companies, provision was made for a merger of the Metropolitan Company and the New York Company with the Manhattan Company, and the Manhattan Company was to take a surrender or transfer of the capital stock of the stockholders in each of the other companies, and issue in exchange therefor the stock of the Manhattan Company. The holders of the common stock of the Manhattan Company were to surrender such stock, and receive in exchange therefor 85 shares of the consolidated stock for 100 shares of the former stock. It was further provided in said agreement that:

"So soon as this agreement shall have been ratified by the holders of a majority of the capital stock of each of the three companies in corporate meetings, and a majority of the stock of each of the New York and Metropolitan Companies shall have been thereupon surrendered or transferred to the Manhattan Company, the said Manhattan Company shall, in consideration of the making of this agreement by each of the others, assume and become responsible for, and shall pay, satisfy, or discharge, all the liabilities, debts, obligations, causes of action, claims, and demands of every nature which against the New York and Metropolitan Companies, and each of them, do now, or hereafter may, exist, and shall indemnify the said last-mentioned companies against the same. * * * The Manhattan Company shall also be entitled to so much of the property of the New York and Metropolitan Companies, and of each of them, as shall equal the amount of the debts, obligations, and liabilities hereby assumed or indemnified against, and may make use of such property from time to time as the Manhattan Company may be compelled to pay or discharge the same."

Prior to January 1, 1894, all of the stock of the New York Company had been transferred to the Manhattan Company, and that company had thereupon, under the agreement, become merged in the Manhattan Company, and the property and assets of the New York Company had vested in the Manhattan Company. All of the stock of the Metropolitan Company had not, however, been transferred, and the Metropolitan Company was still in existence as an independent corporation, the Manhattan Company operating its road under the lease before mentioned. During the period from the time of the execution of this agreement down to January 1, 1894, the Manhattan Company had expended various sums of money on account of the Metropolitan Company, amounting in the aggregate to $6,217,-929.79. Of that amount, $2,023,487.57 appears to have been expended by the Manhattan Company on account of improvement of the property of the Metropolitan road, and as to that amount the referee allowed the claim as an existing claim against the Metropolitan Company. As to the balance of this sum of $6,217,929.79, it appears to have been paid by the Manhattan Company for judgments obtained against the Metropolitan Company in actions brought to restrain the Metropolitan Company from appropriating the easements of the owners of abutting property in the streets, and to obtain a conveyance of such easements to the Metropolitan Company. This total amount of money paid by the Manhattan Company for the benefit of the Metropolitan Company was, under the lease and tripartite agreement, a claim or demand against the Metropolitan Com-

pany for which the Manhattan Company was entitled to property of the Metropolitan Company sufficient to repay that claim. These payments had been made for the benefit of the Metropolitan Company, and, upon the completion of the merger, the property of the Metropolitan Company, enhanced by these payments made on its account by the Manhattan Company, was absolutely vested in the Manhattan Company; but, until that agreement was completed, the advances made by the Manhattan Company remained a claim or charge against the Metropolitan Company, which could be enforced under the merger agreement by a retention of the property of the Metropolitan Company to that amount. If the merger had never taken place, there can be, we think, no doubt that the Manhattan Company would have had a valid claim against the Metropolitan Company for this amount, and before the Metropolitan Company could have obtained possession of this property it would have been compelled to pay that sum to the Manhattan Company. Thus, the Manhattan Company was certain of its repayment, either by the vesting of the whole property of the Metropolitan Company, enhanced in value by these expenditures, upon the completion of the merger, or the repayment of that amount by the Metropolitan Company necessary to obtain possession of its property in case the merger was not finally consummated. Certainly, no reason appears for charging the portion of the amount paid for construction as an open and subsisting obligation of the Metropolitan Company, and not charging the balance of the amount which had been paid for the acquisition of property rights to enable the Metropolitan Company to continue to operate its road and maintain its structure. But we think that the total amount was an actual subsisting claim against the Metropolitan Company, and was thus property which was subject to taxation. To the other items before mentioned there should therefore be added this sum of $6,217,929.79.

It also appeared that the Manhattan Company had paid the sum of $3,480,988.10 to the owners of property abutting on the streets upon which the relator's elevated structure was erected, for damages sustained by such property owners, and to acquire the easements in the streets necessary for the operation of the relator's road, and that one-third of this sum was for damages sustained by the owners of abutting property, and two-thirds for the acquisition by the relator of the easement of the abutting property in the street. It seems to us quite clear that, so far as this payment related to the damages sustained by the owners of abutting property, its payment resulted in the acquisition of no property by the relator. Such payment was simply the discharge of a right of action of the abutting owners for damages in consequence of a trespass by the relator upon the property of abutting owners in the street. It simply discharged a legal liability. No right of property was acquired by reason of that payment. A different question, however, was presented as to the payment for the acquisition by the relator of an easement in the street. For that payment the relator received a conveyance from the owners of the abutting property of the easement in the street which was appurtenant to the abutting property, and which had been appro-

priated and used by the relator in the operation of its road. That this right of an abutting owner to the use of the street was property, and was protected by the constitution, has become the settled law of this state, and it is because it is such property that the occupation of the street by the relator was a trespass upon real property, and the abutting owners have been allowed to maintain actions to restrain such trespass. Such property in the street, when acquired by the relator, became appurtenant to its railroad structure. This structure was real estate, and was assessed as such; and the easement in the street which had been appurtenant to the abutting property when thus acquired by the relator became appurtenant to its property right which it had acquired from the people and the municipality of the city of New York, and thus added to its value, and was, I think, property in the possession of the relator subject to taxation. Adopting the testimony, which seems to be undisputed, that of the total amount paid by the relator two-thirds was for the acquisition of such easements, such two-thirds, amounting to $2,320,-658.74, represents property of the relator subject to taxation, and this makes the total value of the relator's property subject to taxation $27,602,015.34.

From this, under the statute, the relator would be entitled to deduct the assessed value of the real estate, its indebtedness less than that incurred for the purpose of property nontaxable, and 10 per cent. on its capital. It appeared from the evidence that the relator was indebted to the amount of $11,663,035 for bonds of the relator secured by a mortgage upon its property, and we think the relator was entitled to deduct the total amount of this indebtedness. These bonds were issued in the year 1890, and the proceeds went into the treasury of the company, and were paid out generally for the purposes of the company. It appeared that six years before that time the relator had made certain payments to the Metropolitan Company and the New York Company, which it was claimed were paid for the acquisition of the franchises of these companies, and to enable this relator to operate the railroad; but it certainly could not be said that this indebtedness was incurred in the purchase of such franchises, because six years after the payments were made the company, requiring money for the general purposes of its road, issued bonds and received the proceeds therefor. There was no immediate relation between the payment of this sum of money to secure the franchises of these two corporations and the incurring of the indebtedness upon any of these mortgage bonds, and there is nothing to show that the bonds were issued to acquire the franchises. So in relation to the claim that these bonds were issued to procure money to pay the various judgments obtained against these two companies in the actions by the owners of abutting property. We have included in the taxable assets of the company the claim against the Metropolitan Railroad, and also the easements acquired by the relator upon the road which had vested absolutely in it. So far as these bonds were issued for the purpose of obtaining money to pay for these claims against the Metropolitan Company or for this property, as we have held that the property is taxable, the indebtedness

for its purchase was properly deducted from the value of the relator's property subject to taxation. So far as the money was used for the other purposes of the road, including the payment of its obligations, it was not an indebtedness incurred in the purchase of nontaxable property, and we can find no evidence in the record to show that any amount of this indebtedness was incurred for such purpose. It also appeared that the Manhattan Company had become indebted under its merger agreement with the New York Company for the payment of the bonds of the New York Company outstanding, which amounted in the aggregate to $9,500,000. It appeared that these bonds were issued and the money expended in the erection of the structure of the New York Elevated Railroad Company, which, upon the completion of the merger agreement, had become absolutely vested in the relator. It is not claimed that the bonds were issued by the New York Elevated Company for the acquisition of property not taxable, and the bonds were secured by a mortgage upon the structure of the New York Elevated Railroad Company, the title to which had vested in the relator upon the completion of the merger agreement. By the merger of these two roads, all of the property of the New York Company had vested in the relator, and the relator had become legally liable to pay the principal and interest of these bonds as an obligation of one of the roads which had become consolidated, and which made up the new consolidated company. Upon the completion of this merger, the consolidated company acquired the property of both of the other companies, and, under the statute and agreement between them, became subject to the liability of both of the companies thus consolidated. It had acquired the property subject to the lien of the mortgage to secure the payment of these bonds, and the liability to pay these bonds did not arise because of the transfer to the relator of any franchise of the New York road, but because of the merger of the New York road with the Manhattan road, and the acquisition of the property of the New York road by the Manhattan road. The proceeds of these bonds had been applied to the erection of the structure of the New York road. That structure had become vested in the relator, and was taxable property, and was included in the property owned by the relator subject to taxation. The obligation to pay the money thus expended in creating the structure was an obligation for property subject to taxation. The statute provides: "But no deduction shall be made or allowed for or on account of any debt or liability contracted or incurred in the purchase of nontaxable property or securities owned by him or held for his benefit." 5 Rev. St. (9th Ed.) p. 3219, § 6. This indebtedness was incurred by the New York Company to erect its railroad structure, and was secured by a mortgage upon such property. The property had been acquired by the relator subject to that mortgage, the payment of which the relator had assumed, and we do not think that this obligation to pay the indebtedness secured by the mortgage can be said to have been incurred in the purchase of property that was nontaxable, because at the same time the relator acquired from the New York Company a franchise, and issued its stock in a large amount to the New York Com-

pany. We think, therefore, that this indebtedness should also be deducted.

It also appeared that there were judgments existing against the relator amounting to $744,555.35. These judgments, it would appear, had been rendered in actions by property owners against the relator for trespass upon abutting owners' property in the street. One-third of these judgments was for damages caused by such trespass, and two-thirds for the acquisition of the easement in the street. So far as these judgments were for trespass, they were indebtedness of the company which the relator was entitled to deduct, and one-third of that amount would be $248,185.11. The assessed value of its real estate which the relator was also entitled to deduct was $7,323,200, and thus the relator was entitled to deduct in the aggregate $28,737,420.11,—a sum over $1,000,000 in excess of the value of its property subject to taxation,—without making a deduction of 10 per cent. of the relator's capital stock.

A summary of the statement would be as follows:

Value of the property subject to taxation on the second Monday of January, 1894:

| | |
|---|---:|
| Value of railway and structure, with interest thereon for two years at 6 per cent. | $ 9,823,057 00 |
| Real estate other than structure | 5,120,216 00 |
| New York equipment | 2,213,602 59 |
| Suburban equipment | 142,175 13 |
| Cash on hand | 1,332,838 00 |
| Tools and machinery | 381,538 09 |
| Open accounts | 6,217,929 79 |
| Easements in the street acquired from abutting owners | 2,320,658 74 |
| | $27,602,015 34 |

| | |
|---|---:|
| Indebtedness, etc., deducted: | |
| Bonds of the relator | $11,663,035 00 |
| Bonds of the New York Elevated Railroad mortgage | 8,500,000 00 |
| Bonds New York Elevated Railroad debenture | 1,000,000 00 |
| Judgments, proportion for damages | 248,185 11 |
| Assessed value of real estate | 7,323,200 00 |
| | $28,737,420 11 |

As it appeared, therefore, that the property of the relator subject to taxation was less than the amount of the deductions to which it was entitled under the statute, it follows that the respondents were not justified in making any assessment upon which the relator was liable to taxation.

We are quite aware that this is in conflict with the view entertained by the special term. It is, however, the result of a careful consideration of the argument of counsel for the respondents and the opinion of the court at special term. In dealing with this question, we have been guided by what we understand to be the views expressed by the court of appeals in the late cases involving the assessment of the property of this relator. And while this corporation earned the interest upon its bonded indebtedness, with 6 per cent. dividend upon its capital stock, and was able to accumulate during the year prior to the date of its assessment a surplus of $1,000,000, and the relator in its report to the railroad commission-

ers had stated that the cost of its structure and railroad was largely in excess of that for which it could now be produced, when we come to ascertain the value of the property belonging to this company upon a particular date we think we are bound by the specific testimony as to its value at the time, rather than admissions of the relator as to the cost of the property many years before. Whatever inferences might be drawn from these facts as to the earning capacity of the road, or its cost to the company, such inferences should not be allowed to override the express testimony as to what this road is now worth, not in connection with its franchise, as such franchise is not taxable under this statute, but as property distinct from the right to use it, which right is acquired by the grant of the franchise. Whatever injustice there is in allowing this corporation, with its large productive property, to escape bearing its proper portion of the burden of taxation, arises from the fact that this franchise granted to it by the people, and which enables it to operate its road, and thus earn its large return to its stock and bond holders, was not taxable property. As to that property the state had exempted it from taxation, and neither the tax commissioners nor the court have the power to impose a tax upon the franchise which is owned by the relator, and which enables it to apply its property in such a way as to produce the earnings referred to. Provision for taxing such franchise is for the legislature, and not for the administrative officers or for the court. Although the legislature has recently passed an act taxing franchises, such act did not exist in 1894, when the assessment complained of was made. All that this court has to do is to ascertain the fair cash value of the property that the state has said shall be taxed, and, allowing the relator the deductions which the statute authorizes, determine upon what, if any, sum the relator should be taxed. Applying these principles, it would appear that there is no sum upon which the relator should be taxed.

It follows that the reassessment of the capital stock and surplus of the Manhattan Railway Company for the year 1894 is erroneous, and the same is wholly vacated and set aside and stricken from the assessment roll, with costs in this court and the court below. All concur.