45908, 45909. WEST et al. v. BAUMGARTNER; and vice versa.
45910, 45911. WEST et al. v. PADGETT; and vice versa.
45912, 45913. WEST et al. v. PADGETT; and vice versa.

ARGUED JANUARY 8, 1971—DECIDED JULY 7, 1971—
REHEARING DENIED JULY 27, 1971— 

*Oliver, Maner & Gray, Thomas S. Gray, Jr., Bennet, Gilbert, Gilbert & Whittle, Wallace E. Harrell,* for appellants.

*Alton D. Kitchings,* for appellees.

PANNELL, Judge. Edward H. Baumgartner, Rudolph A. Padgett and James E. Padgett, in the Superior Court of Chatham County, Georgia, brought separate complaints in two counts against Eleanor T. West; The Citizens & Southern National Bank of Georgia, co-trustee and William F. Torrey, Jr., as co-trustee, under

a trust set up under the last will and testament of Nelle Ford Torrey; William F. Torrey, Jr., individually and as beneficiary; Annette Torrey Frazer, individually and as beneficiary; Emory M. Torrey, individually and as beneficiary; Randall F. Torrey, a minor, individually and as beneficiary; Julian C. Sipple, an attorney; and Ossabaw, Inc. By amendment Ossabaw Island Project Foundation was made a party defendant. The complaints were brought in two counts. The first count sought recovery for alleged false imprisonment. The second count sought recovery on the basis of an alleged malicious prosecution. The facts alleged in both counts, in so far as here material, is that Julian C. Sipple, acting as attorney for all of the defendants, on November 12, 1967, while the complainants were fishing with hook and line from a boat in what is known as the South Slough, a tidal water, of Ossabaw Island, called to the complainants and commanded them to bring the boat to the shore and give him their names and addresses which the complainants did to avoid force, thinking Sipple to be an officer of the law. After securing the names and addresses, Sipple then told them that they were violating the law and demanded that they leave, which they did. Later, Sipple wrote a letter to the parties requesting that they sign an agreement not to fish in the waters of Ossabaw Island in the future. The complainants refused to sign such an agreement and Julian C. Sipple swore out a warrant against them, charging them with fishing in the waters of another in violation of Section 81 of the Act of 1955 (Ga. L. 1955, pp. 483, 523; Code Ann. § 45-701). They were arrested, gave bond, and upon trial were acquitted. The answers of the parties denied the material allegations of the complaint as to the authority of Sipple to act as attorney for the parties, with the exception of Ossabaw Island Project Foundation. Ossabaw, Inc., answered, alleging it was not in existence at the time of the alleged occurrence. Motions for summary judgment were filed by some of the defendants which were overruled by the trial judge and with proper certificate of review were appealed to this court. While these cases were pending review here, all of the defendants jointly made a motion for summary judgment presenting some additional evidence for consideration by the trial judge. After appeals were docketed in this court from the order of the trial judge overruling the second

motions for summary judgment by all the defendants as to Count 2 of the petitions, and cross appeals from the ruling of the trial judge granting all the defendants' motions for summary judgment as to Count 1 of the complaint, the first appeals were dismissed as moot. *Citizens & Southern Nat. Bank of Ga. v. Baumgartner,* 123 Ga. App. 462 (181 SE2d 519). The latter appeals and cross appeals are presented for review in the present case.

Divisions 1 through 5 of the opinion deal with the main appeals. Division 6 deals with the cross appeals. The basic contentions of the appellants in the main appeals are: (1) The Act of 1902 (Ga. L. 1902, p. 108; *Code* §§ 85-1307, 85-1308, 85-1309) granted exclusive rights of fishery to the owners of Ossabaw Island in all non-navigable tidal waters ebbing and flowing on or across the island, and (2) there was probable cause as a matter of law for prosecuting the complainants, and (3) some of the defendants are not liable, and should have been granted summary judgments, because the chief actor, the attorney Sipple, did not represent them and was not their agent or employee in committing the acts complained of.

■ ■ Since the appellants claim in right of the State under the Act of 1902, we must first look into the rights of the State and the public prior thereto and whether the State by this Act conveyed exclusive fishing rights to the owners of non-navigable waters as defined in that Act. "At common law, in the absence of any special title by grant or prescription, the boundary of landowners abutting on the sea, or upon any estuary, tidal stream, or arm of the sea where there was a regular rise and fall of the tide, extended only to high-water mark. The soil between high-water mark and low-water mark was the property of the crown. This rule, so far as the boundary of the abutting landowner is concerned, has been almost universally followed in the United States. See 4 Am. & Eng. Enc. L. (2d Ed.) 818-820, and cases cited; Tyler, Boundaries, 31 et seq." *Johnson v. State,* 114 Ga. 790, 791 (40 SE 807). In that case, it was also held that the definition of a navigable stream and the defining of the rights of the adjacent owners as extending to the low-water mark of the bed of the stream as set forth in *Code* §§ 3059 and 3060 of the Code of 1895 (§§ 85-1303; 85-1304 of the Code of 1933), are not applicable to tidal

waters. Under the rationale of this ruling, neither does *Code* § 85-1305 apply to tidal waters. See *Hendricks v. Cook,* 4 Ga. 241, 255; *Jones v. Water Lot Co. of Columbus,* 18 Ga. 539; *Stanford v. Mangin,* 30 Ga. 355. The theory that ownership of tidal waters is in the State or the Sovereign has come down to us from the common law, as well as the right of the public to the common fishery in tidal waters. "Lord Hale, in the treatise ascribed to him, aptly compares the King's property in the sea and tide-rivers, creeks, &c., to the ownership of lords of manors in the common or waste lands of the manor. The soil and freehold of the waste belong to the lord, but subject to certain rights of the manorial tenants; such as common of pasture, piscary, turbary, ways, &c., claimed and enjoyed by them, by the custom of the manor, in and out of such waste lands. So the King is lord of the great waste of the sea, subject to certain beneficial rights and privileges of fishing, navigation, &c., immemorially enjoyed by his subjects therein, by the custom of the realm, which is the common law." Moore, History & Law of the Foreshore and Sea Shore (3d Ed.), p. 670. "Now, as we have already attributed the absolute ownership of the sea, and sea-shore, to the King, ab origine,—it might be thought that the above perquisites are absolutely his own, and grantable exclusively to any one of his subjects. But according to the acknowledged law of the land, although the King is owner of this great waste, *yet the common people of England have regularly a liberty of fishing in the sea, and creeks and arms thereof, and in navigable rivers within the tides, as a public common of piscary.*

"This public or general right of fishing in the sea, claimed by the subject, is a beneficial privilege enjoyed by British subjects, time out of mind. Whether, in fact, it was originally a public grant from the King, or whether it was a reservation by the people of such right, when they vested the rest of the property in the sea in him, or whether it be one of those natural and necessary rights which, like the air we breathe, has ever been free and unquestioned in enjoyment, is immaterial; for the conclusion is the same; viz., that such right of fishing has immemorially belonged to, and been enjoyed by the public, and that, in point of title, it is admitted to be held and enjoyed *by common right,* i.e., by the common law, and custom of the Realm." Id., p. 710.

"By the common law, both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high-water mark, within the jurisdiction of the crown of England, are in the king. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the king's subjects. . . It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high-water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention. . . The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country. . ." Shively v. Bowlby, 152 U. S. 1, 11, 13, 14 (14 SC 548, 38 LE 331).

In 1673 in Lord Fitzwalter's case, 1 Mod. 105, 86 Eng. Reprint 766, it was said: "In case of a private river, the lord's having the soil is good evidence to prove, that he hath the right of fishing; and it puts the proof upon them that claim liberam piscariam. But in case of a river that flows and reflows, and is an arm of the sea, there, prima facie, it is common to all; and if any will appropriate a privilege to himself, the proof lieth on his side; for in case of an action of trespass brought for fishing there, it is, prima facie, a good justification to say, that the locus in quo is brachium maris, in quo unusquisque subjectus dum Regis habet et habere debet liberam piscariam. In the river Severn there are particular restraints, as gurgites [defined in Black's Law Dictionary as "wears" or "weirs," a great dam or fence made across a river, or against water, formed of stakes interlaced by twigs . . .] &c. but the soil doth belong to the lords on either side; and a special sort of fishing belongs to them likewise; but the common sort of fishing is common to all. The soil of the river of Thames is in the King; and the Lord Mayor is conservator of the river, and it is common to all fishermen; and therefore there is no such contradiction betwixt the soil being in one, and yet the river being common for all fishers, &c.

"See the case of the Royal fishery of the river Bann in Ireland, Dav. Rep. 149. Salk. 137. Carter v. Murcot, 4 Burr. 2162, 2165. Seyman v. Courtness, 5 Burr. 2814. 2 Black. Com. 139. The Mayor of Lynn v. Turner, Cowp. 16. Dougl. 56, 443, 517. 3 Term Rep. 253. The Mayor of Oxford v. Richardson, 4 Term Rep. 437." See also Bristow v. Cormican (1878 Eng.) LR 3 App. Cas. 641—HL. As was said in 35 AmJur2d 651, Fish & Game, § 6; "Clearly, however, in the absence of any prescriptive right, or any grant or regulation by the state, there exists in the general public a common right to fish in all the arms of the sea and to the public waters of the state."

This State in 1784 (Cobb's Digest, p. 721; Prince's Digest, p. 570; Code of 1863, § 1, par. 6) adopted the common law of force prior to May 14, 1176, except where modified by statute or not adjusted to our situation (*Flint River Steamboat Co. v. Foster,* 5 Ga. 194, 195 (5) (48 AD 248); *Harris v. Powers,* 129 Ga. 74 (2) (58 SE 1038, 12 AC 475); *Louisville & N. R. Co. v. Wilson,* 123 Ga. 62, 67 (51 SE 24, 3 AC 128)); and the common law decisions of the English courts prior to the adopting statute are authority in Georgia. *Tucker v. Adams,* 14 Ga. 548, 569; *Brown v. Burke,* 22 Ga. 574. The rule above set forth seems to have been clear and well-settled at the time we adopted the common law. We therefore conclude that this State would have ownership of the lands under the tidal waters (other than those conveyed by the crown prior to the Revolution) and that the public generally has the right to fish upon said waters and the owner of the abutting soil has no exclusive right of fishery therein. See also 35 AmJur2d 650, § 6, n. 20; 35 AmJur2d 652, § 7, n. 7, 8; 35 AmJur2d 654, § 11, n. 18.

Since, in this case, the act of the State (the Act of 1902) conveying title to the lands in the bed of the navigable and non-navigable tidal streams as defined in that Act has been ratified and affirmed by the people in a constitutional amendment (Art. II, Sec. VI, Par. I of the Constitution of 1945; *Code Ann.* § 2-601), it is not necessary to determine whether the State's right in the land and the waters was a proprietary interest or was in trust for the benefit of the public, which may involve different rights in the State, particularly insofar as the right of the State to give exclusive rights of fishery to one member of the public over another mem-

ber of the public. See in this connection Moore, History & Law of the Foreshore and Sea Shore (3d Ed.), Ch. XIX.

■ Having determined that, under the common law, the right to the soil is in the State and that the public has a right of common fishery in all tidal waters, whether actually navigable or non-navigable, the next question to be determined is the effect of the Act of 1902 and what rights of fishery it conveyed if any. "The right of ownership of the soil and the right of fishery in the waters thereof are not necessarily co-extensive. Where the state owns the soil under . . . waters, it may convey merely the soil without an exclusive right of fishery; in such a case, the grantee takes the soil subject to the piscatory rights of the public. *A grant of the soil will ordinarily not be construed to convey the fishing rights unless the intention to do so is so clearly and fully expressed that the grant is incapable of any other reasonable construction.*" 35 AmJur2d 652, Fish and Game, § 7. (Emphasis supplied). See also Hogg v. Beerman, 41 Ohio St. 81 (52 AR 71). The very concept which we have here described involves title in the king in the land with the right of common fishery in the public. "But according to the acknowledged law of the land, although the King is owner of this great waste, *yet the common people of England have regularly a liberty of fishing in the sea, and creeks and arms thereof, and in navigable rivers within the tides, as a public common of piscary.*" Moore, History & Law of the Foreshore and Sea Shore (3d Ed.), p. 711. It appears, therefore, that title to the land does not automatically carry with it the exclusive right of fishery in tidal waters. Lord Fitzwalter's case (1673), 1 Mod. 105, 86 Eng. Rep. 766. Where tidal waters are not involved the ownership of the fee in the bed of the stream generally carries with it the exclusive right of fishery in the stream. See in this connection *Lee v. Mallard,* 116 Ga. 18 (1) (42 SE 372); *Thompson v. Tennyson,* 148 Ga. 701 (98 SE 353); *Bosworth v. Nelson,* 170 Ga. 279 (152 SE 575). We reach the conclusion, therefore, that the mere grant of the title to the land over which the tide ebbs and flows did not necessarily convey the rights of fishery unless elsewhere in the Act "the intention to do so is so clearly and fully expressed that the grant is incapable of any other reasonable construction."

The title to the Act of 1902 (Ga. L. 1902, p. 108) reads as fol-

lows: "An Act to fix and prescribe the boundaries of land adjacent to or covered by or bordering on the tide-waters of this State, and to prescribe all rights of the owners of such adjacent lands within such boundaries, and to define navigable tide-waters, and for other purposes." The remainder of the Act (not including the enacting and repealing clause) reads as follows:

"Section 1. That from and after the passage of this Act the title to the beds of all tide-waters in this State, where the tide regularly ebbs and flows, and which are not navigable under section 2 of this Act, shall vest in the present owner of the adjacent land for all purposes, including among others, the exclusive right to oysters, clams and other shell fish therein or thereon. If the water is the dividing line, each owner's boundary shall extend to the main thread or channel of the water. If the main thread, or center, or channel of the water changes gradually, the line follows the same, according to the change. If for any cause it takes a new channel, the original line, if capable of identification, remains the boundary. Gradual accretions of land on either side accrue to the owner.

"Sec. 2. Be it further enacted by the authority aforesaid, That a navigable tide-water, in contemplation of this Act, is any tide-water, the sea or any inlet thereof, or other bed of water where the tide regularly ebbs and flows, which is in fact used for the purposes of navigation, or is capable of bearing upon its bosom at mean low tide boats loaded with freight in the regular course of trade. The mere rafting of timber thereon, or the passage of small boats thereover, whether for the transportation of persons or freight, shall not be deemed navigation within the meaning of this Act, and does not make tide-water navigable.

"Sec. 3. Be it further enacted by the authority aforesaid, That for all purposes, including among others the exclusive right to the oysters and clams (but not to include other fish) therein or thereon being, the boundaries and right of owners of land adjacent to or covered in whole or in part by navigable tide-waters, as defined in section 2 of this Act, shall extend to low water mark in the bed of the water; provided, however, that nothing in this Act contained shall be so construed as to authorize such an exclusive appropriation of any tide-water, navigable or unnavigable, by any person

whomsoever, as to prevent the free use of the same by others for purposes of passage and for the transportation of such freights as may be capable of being carried thereover."

Any intent on the part of the legislature under Section 1 of the Act to vest in the owner of the adjacent land any exclusive fishing rights, if any, must be gained from the language "shall vest in the present owner of the adjacent land for all purposes, including among others, the exclusive rights to oysters, clams and other shell fish therein or thereon." Having already determined that the mere conveyance of title to the land did not necessarily convey fishing rights, the language that the title is conveyed "for all purposes" carries with it no connotations of any rights of fishery, and any rights of fishery conveyed thereby must be determined from the remaining language. The remaining language grants only the exclusive right to oysters, clams and other shell fish, and applying the maxim expressio unius est exclusio alterius or the maxim expressum facit cessare tacitum (*Bailey v. Lumpkin,* 1 Ga. 392, 403 T.U.P. Charl. 195; *White v. Clements,* 39 Ga. 232, 265), the language "including among others" is limited to fish of the nature of oysters, clams and shell fish. It is contended that similar language in Section 3 of the Act "for all purposes, including among others the exclusive right to the oysters and clams (but not to include other fish) therein or thereon being, . . ." because of the portion in parentheses shows an intent that other fish are included in the language of Section 1. If it were not for the strict construction to be applied to this Act there might be some merit in this contention, but the language in parentheses in Section 3 under the doctrine of ejusdem generis could be construed to mean "other shell fish" since Section 3 mentioned only oysters and clams, whereas Section 1 mentioned oysters, clams and other shell fish. We reach the conclusion, therefore, that the grant in Section 1 of the Act of 1902 "including among others, the exclusive right to oysters, clams and other shell fish therein or thereon," insofar as the exclusive right of fishery is concerned, conveys only the exclusive rights to oysters, clams and other shell fish.

■ There is nothing in the record which indicates that the complainants, at the time and place in question, were fishing for or taking any such fish. "Want of probable cause is a question for

the jury, under the direction of the court. The question of probable cause is a mixed question of law and fact. Whether the circumstances alleged to show probable cause existed is a matter of fact, to be determined by the jury, but whether they amount to probable cause is a question of law for the court. *Coleman v. Allen,* [79 Ga. 637 (5 SE 204, 11 ASR 449)]; *Porter v. Johnson* [96 Ga. 145 (23 SE 123)]; *Woodruff v. Doss,* 20 Ga. App. 639 (93 SE 316); *Anderson v. Keller,* 67 Ga. 58; *Stewart v. Mulligan,* 11 Ga. App. 660 (75 SE 991); *Brookshier v. Williams,* 19 Ga. App. 685 (91 SE 1056); *Thornton v. Story,* 24 Ga. App. 503 (101 SE 309); *Benford v. Bledsoe,* 26 Ga. App. 361 (106 SE 202); *Sirmans v. Peterson* [42 Ga. App. 707 (157 SE 341)]." *Hearn v. Batchelor,* 47 Ga. App. 213, 214 (170 SE 203). The fact that the defendants may have thought that the acts of the plaintiffs constituted a crime is not sufficient to show probable cause and the defendants cannot be permitted to set up ignorance of the law as exemption from damages for a tort. See *Vasser v. Berry,* 85 Ga. App. 435 (69 SE2d 701). Accordingly, there was no probable cause for the prosecution of the complainants by any of the appellants, as the acts upon which the prosecution was based did not constitute all or part of the crime of fishing in the waters of another under Section 81 of the Act of 1955 (Ga. L. 1955, pp. 483, 523; *Code Ann.* § 45-701).

▪ While a prior ruling in other cases by a trial judge that other defendants committing the same acts as the complainants in this case were guilty of the violation of Section 81 of the Act of 1955, supra *(Code Ann.* § 45-701), may be evidence of good faith on the part of the defendants and may go in mitigation of the damages or to disprove malice, such fact alone does not show probable cause where under the full facts no crime had been committed, nor do these facts demand a finding of lack of malice inasmuch as malice may be inferred from a total want of probable cause. See *Stuckey v. Savannah, Fla. &c. R. Co.,* 102 Ga. 782 (29 SE 920); *Cook v. Walker,* 30 Ga. 519; *Page v. Citizens Banking Co.,* 111 Ga. 73 (36 SE 418, 51 LRA 463, 78 ASR 144). "Probable cause may involve a question of law as well as of fact, and belief that a given state of facts constitutes a crime when such is not the case does not, under most authorities, amount to reasonable or probable cause. Hence, if the facts charged do not amount to a criminal

offense, the one making the charge is not protected by proving the truth thereof or his belief that the facts charged constituted a criminal offense." 54 CJS 993, § 32. See also Smith v. Deaver, 49 N. C. 513; Brown v. Kisner, 192 Miss. 746 (6 S2d 611); State Life Ins. Co. of Indianapolis, Ind. v. Hardy, 189 Miss. 266 (195 S 708). The rule is the same in this State. See *Vasser v. Berry,* 85 Ga. App. 435, supra.

■ Accordingly, it is undisputed in the present case that the attorney defendant, who was a chief actor and who took out the warrant against the complainants and actively engaged as a prosecutor is not entitled to a summary judgment in his favor. However, the question remains as to which of the other defendants were represented by this attorney in, or ratified his acts relating to, this prosecution and the events occurring immediately before. There may be evidence here which would authorize a finding eliminating some of the defendants on the theory that the attorney acted without their knowledge and without their consent and did not represent them in the acts and doings which are the subject matter of this litigation. However, the answer of the attorney to the request for admissions and his affidavit submitted are sufficient to prevent the grant of a summary judgment to any of the owners and beneficiaries on the ground that the attorney was not representing them at the time of the occurrence in question. The complainants, in their request for admissions, in request number 5, sought admission of the following: "Admit that the defendant, Julian C. Sipple, has for several years represented the owners and beneficiaries named in this action in matters pertaining to their interest in said island in the capacity of agent as an Attorney at Law, . . ." The defendant attorney, Julian C. Sipple, gave the following answer: "5. Answering [paragraph] 5, defendant shows that defendant, Julian C. Sipple, has, on occasion, represented defendant, Eleanor T. West in matters pertaining to her interest in Ossabaw Island." Paragraph 36 of the Civil Practice Act (*Code Ann.* § 81A-136) provides that: "A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party deny only a part or a qualification of a matter of which an admission is requested, he shall specify so much of it as is true and deny only the remainder." In our opinion, the an-

swer to the first part of paragraph 5 admitting that he represented two of the parties with no denial that he represented the others and no admission that he represented the two *solely* so as to clearly amount to a denial that he represented the others, was an equivocal answer and was legally an evasion of the request and was not a denial or a good faith qualified denial of the facts contained in the request and the facts must be taken as admitted, and in the light of this admission the materials presented on summary judgment did not demand a finding that any of these defendants were not represented by the attorney Sipple. See United States v. Jefferson Trust & Sav. Bank (SD Ill., 1962) 31 FRD 137, 6 FR Serv2d 36a.51, Case 1.

Further, in paragraph 2 of his affidavit, the attorney, without qualifying said statement in any manner, stated that "in his capacity as a practicing attorney, deponent has represented the owners of Ossabaw Island and handled the legal matters concerning such island for said owners for approximately 18 years" and in paragraph 7 of said affidavit stated that he took out the criminal warrant against the complainants "at the direction of Eleanor Torrey West, one of the owners of Ossabaw Island, who was also an official of Ossabaw Island Project Foundation" and this Foundation paid his fee. We, therefore, conclude there was sufficient evidence to make an issue as to whether the attorney was acting for all of the defendants, with the exception of Ossabaw, Inc.

■ Ossabaw, Inc., having been formed as a corporation subsequent to the alleged acts constituting the alleged malicious prosecution, could not, under the law, be liable therefor, and there is nothing in the record indicating (assuming a corporation could legally do so), that the corporation ratified the alleged tort or assumed any obligations in reference thereto. The fact that Ossabaw, Inc., was formed for the purpose of receiving a distribution from the trustee defendants of the properties owned by the trust would have no bearing on this question, as the question of whether such distribution is in fraud of creditors or whether complainants could follow the assets in the event they secure a judgment are not questions raised for decision in the present case. We accordingly affirm the trial judge in his denial of summary judgments as to Count 2 of the complaints as to all of the defendants

other than Ossabaw, Inc., and as to Ossabaw, Inc., his denial of summary judgment in each complaint is reversed.

■ Appellee complainants contend that under Count 1 they were seeking recovery for false imprisonment, and while conceding that the detention of the complainants when arrested under the warrants issued is merged into Count 2, alleging a claim for malicious prosecution (*Lovell v. Drake*, 60 Ga. App. 325 (3 SE2d 783); *Floyd County Dairies v. Brooks*, 61 Ga. App. 239 (6 SE2d 360), they insist that the actions of the attorney at the time he secured their names and addresses while they were fishing in the slough constituted such restraint as would authorize a finding of false imprisonment. Assuming, without deciding, that these acts, if constituting such restraint, were not merged into the action for malicious prosecution set forth in Count 2 of the complaints (see, however, *Godwin v. Gibson's Products Co.,* 121 Ga. App. 59 (172 SE2d 467)), we cannot agree that these actions did amount to such restraint as would constitute false imprisonment. The evidence is uncontradicted that the attorney demanded or requested that the complainants come to shore and give their names and addresses. The complainants did this and were then ordered off the premises with the statement that they were violating ohe law and had no rights upon the slough. The complainants, thinking that the attorney was an officer of the law, obeyed him and were in fear of bodily harm, that is, that they might be shot, if they refused to obey, although the evidence discloses no act on the part of the attorney which gave rise to such fears. While "the restraint constituting false imprisonment may arise out of words, acts, gestures, or the like, which induce a reasonable apprehension that force will be used if plaintiff does not submit, and it is sufficient if they operate upon the will of the person threatened and result in a reasonable fear of personal difficulty or personal injuries" (*Sinclair Refining Co. v. Meek,* 62 Ga. App. 850 (3) (10 SE2d 76)), the evidence in this case demands a finding that the attorney did nothing to induce a reasonable fear in the complainants that there would be a personal difficulty or personal injury if they had refused the command or request made. It follows, therefore, that the trial court did not err in sustaining the motion for summary judgment of all the defendants as to Count 1 of the petitions.

*Judgments in cases numbers 45908, 45910 and 45912 (main appeals) are affirmed in part and reversed in part. Bell, C. J., Whitman and Evans, JJ., and Judge Claude D. Shaw, concur. Jordan, P. J., Hall, P. J., and Deen, J., and Judge Clarence L. Peeler, Jr., dissent. All the Judges concur in cases numbers 45909, 45911 and 45913 (cross appeals), which are affirmed. Eberhardt and Quillian, JJ., disqualified.*

DEEN, Judge, dissenting. Under Section 1 of the Act of 1902, the State ceded ownership of the land under the non-navigable tidal waters to "the present owner of the adjacent land *for all purposes,* including among others the exclusive right to oysters, clams and other shellfish therein or thereon." "The rule [of ejusdem generis] however, does not necessarily require that the general provision be limited in its scope to the identical things specifically named. Nor does it apply when the context manifests a contrary intention." Black's Law Dictionary, 4th Ed. Obviously "for all purposes" does not mean only the right to the oysters and other shellfish, simply because they are specifically named. It would not prevent the owner of the land under the water, for instance, from driving pilings, building a dock, and so on. The majority opinion construes "all purposes" to mean "all purposes except fishing," but the word "including" may as easily be taken to mean an emphasis on a formerly disputed attribute of the water bed rather than an implied exclusion of another. At least, the question had never been raised in the Georgia appellate courts, the otherwise plain affirmative language had never been construed as meaning less than it said, and prosecutions under the statute were regularly being carried on in the courts of Chatham County and prosecuted to a successful conclusion based on the assumption that the ownership of the tidal bed included (as it generally does) the right to keep trespassers off the waters above it, whether they were fishing or not, on the theory that ownership extends up and down to a reasonable distance. (Cf. mineral rights and air rights cases). Under these circumstances, there should be a presumption in favor of the applicability of the law under the "for all purposes" provision until limited by court construction, in the same way that where a plaintiff in a malicious prosecution case is prosecuted under a statute which it develops was in fact unconstitutional,

this has no bearing on the issue of probable cause because "every statute should be considered valid until a judicial determination to the contrary, and . . . the parties instituting the prosecution have a right to act on the assumption that it is valid." 54 CJS 978, Malicious Prosecution, § 21; Birdsall v. Smith, 158 Mich. 390 (122 NW 626); Southern Ice &c. Co. v. Bench, 179 Okla. 50 (64 P2d 668).

The majority opinion (p. 328) goes even further and holds not only that the statute and record of convictions thereunder do not constitute probable cause (assuming the defendants are otherwise guilty) but they only pose a jury question as to lack of malice since "malice may be inferred from a total want of probable cause." If the plaintiff acted in the belief that the statute was valid, which does not appear to be a contested fact, then to charge him ex post facto with malice because of lack of probable cause because the statute is *now* being construed differently from what it was at the time of the event is violative of fundamental concepts of justice. The determination must be made as of the time the warrant was taken out, on which date the statute was as a matter of fact completely viable and the words "for all purposes" were being given their usual meaning in the local courts. If this case is to turn only upon the interpretation of the statute, then a finding is demanded that there was probable cause *at that time* to believe the plaintiffs in this action guilty of a trespass.

This is a different matter from a mere interpretation of the law by a lay person or a lawyer because, even though the appellate courts had not spoken at the time the local courts had, thus giving judicial sanction (whether binding or not is of no importance because here we are dealing with motive, not legal consequences) to the interpretation put on the statute by the defendants in this case.

I believe the following case to be controlling on this point: *Tanner-Brice Co. v. Barrs,* 55 Ga. App. 453 (190 SE 676): " 'In actions for malicious prosecution, the question is, not whether the plaintiff was guilty, but whether the defendant had reasonable cause to so believe—whether the circumstances were such as to create in the mind of the defendant a reasonable belief that there was probable cause for the prosecution. Johnson v. Miller, 63

Iowa 529. Probable cause is defined to be the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted. 14 Am. & Eng. Enc. L. 24, and authorities cited.' *Hartshorn v. Smith*, 104 Ga. 235, 239 (30 SE 666); *Sirmans v. Peterson*, 42 Ga. App. 707, 709 (157 SE 341); *Hearn v. Batchelor*, 47 Ga. App. 213 (170 SE 203)."

I am authorized to state that Presiding Judge Jordan and Judge Clarence L. Peeler, Jr., concur in this dissent.